NEW OMAHA THOMPSON-HOUSTON ELECTRIC LIGHT COMPANY V. JOHNERSON C. ROMBOLD.*

FILED MARCH 4, 1903. No. 12,306.

1. **Personal Injury:** ELECTRICITY: NEGLIGENCE: INSTRUCTION. Where evidence tended to show that a lineman of an electric lighting company was injured by inadvertently passing between a pair of exposed splices situated within two feet of a post on wires carrying a strong current of electricity, and that the lack of insulation had continued during time of lineman's employment, *held* not error to tell the jury that failure to make reasonable effort to provide a safe working place for the employee, and consequent negligence, might be inferred from the mere fact that the splices were not insulated, if the jury found that reasonable care would have required their insulation.

2. **Due Care:** QUESTION OF FACT. *Held*, that whether or not due care on the lineman's part required that he see and avoid contact with the exposed splices was properly left to the jury.

3. **Evidence:** ASSUMPTION OF RISK: QUESTION OF FACT. The evidence showing that no inspectors were employed, and that lineman was instructed to repair or report defects of insulation observed by him, the question as to whether or not he had assumed the risk from this defect of insulation was properly left to the jury.

4. **Receipt:** ESTOPPEL. One to whom a receipt in full settlement of all damages has been, in order to procure his signature, misread so as to cause him to think it a receipt and settlement of certain expenses only, is not estopped from disputing its validity by the fact that, relying upon such information as to its contents, he signs without reading it.

---

*Reversed on rehearing. See opinion, p. 71, *post*.

5. **Damages.** Where plaintiff, an electric lineman of 33 years of age, earning $65 monthly, has been injured in both feet and one ankle in such a manner as to compel amputation of the right foot almost eleven months later, with severe suffering, a verdict for $15,000 will not be reduced or set aside as excessive.

ERROR to the district court for Douglas county: WILL-IAM W. KEYSOR, DISTRICT JUDGE. *Affirmed.*

*Charles J. Greene, Ralph W. Breckenridge, James C. Kinsler* and *W. W. Morsman,* for plaintiff in error.

*Timothy J. Mahoney, J. J. Boucher, Herbert M. Crane, Thomas D. Crane* and *O. S. Erwin, contra.*

HASTINGS, C.

June 12, 1899, plaintiff below, Rombold, commenced his action against the New Omaha Thompson-Houston Electric Light Company to recover alleged damages in the sum of $25,000 for an injury received by him in defendant's service, as he alleged, in the following manner: That March 22, 1898, he entered the company's employ as lineman, it being his duty under defendant's direction to erect poles, place cross-bars on them, and string wires in the streets of Omaha wherever and whenever defendant directed; that he continued in the company's employ up to July 1, 1898, and on that day was stringing wires on poles and cross-bars at Jones street, between Fourth and Fifth; that he was directed to climb to the top of the pole, about 45 feet, for the purpose of stringing a wire upon the top cross-arm; that there were eight cross-arms about twenty inches apart attached to the pole, and on each arm electric and telephone wires to the number of from four to six, the wires being about sixteen inches apart; that there were twenty-six electric wires covered with insulating material; that on the second cross-arm from the top were two wires fourteen inches apart, known as No. 4, which were insulated, and charged with a heavy current

of electricity; that these wires were spliced at a distance of about two feet west from the cross-arm, and so negligently that the ends of said wires extended out at right angles to a distance of one inch and beyond the insulation; that it was defendant's duty to cover all splices with tape, prepared for that purpose, to protect employees from contact with any wires not insulated and from receiving injuries in that manner; that these splices were not taped, and remained without any covering whatever; that plaintiff went up on the east side of the cross-arms and to the north of the pole between these two wires, completed the stringing of the wire, started to descend on the west side of said cross-arm, between the same wires, until he came to a point between the said splices, and there, without any fault on plaintiff's part, his right arm came in contact with the uncovered splice of the wire next to the pole, and at the same instant the back of his left shoulder came in contact with the uncovered splice on the second wire; that this permitted a "short circuit" between the wires through the body of the plaintiff as a conductor, and gave plaintiff an electric shock which overpowered him, caused him to lose his hold, and threw him to the ground, breaking his left foot and right ankle; that as a result of the injury it became necessary to amputate his right foot, on May 25, 1899; that he was permanently injured and rendered wholly unable to perform any labor, and suffered great pain, to his damage in the sum of $25,000, and that he expended for medicine, care and hospital services $600.

The answer admits defendant is a corporation lighting the streets of Omaha by electricity, and maintaining a plant for that purpose; admits the employment of the plaintiff up to July 1, 1898, as alleged, and denies plaintiff's remaining allegations. The answer also alleges that plaintiff's employment required him to go among defendant's "live wires"; that his work required great care and attention on account of dangerous electricity, as plaintiff well knew, and that while so employed he received an electric shock which caused him to fall a con-

siderable distance to the ground; but says that it was not negligent toward the plaintiff, and that his fall and any other injury were occasioned entirely by the careless and negligent manner in which he performed his work under conditions all of which he well knew.

The answer also alleges that on October 12, 1898, plaintiff demanded reimbursement for his damage; that defendant, while denying liability, paid him $325, and received from him a release in full in the following terms:

"Received of New Omaha Thompson-Houston Electric Light Co. this twelfth day of October, 1898, the sum of three hundred and twenty-five dollars, in full satisfaction and discharge of all claims accrued or to accrue in respect of all injuries or injurious results, direct or indirect, arising or to arise from an accident sustained by me on or about the first day of July, 1898, while in the employment of the above.

"$325.00.                         J. C. ROMBOLD.

"Witness: W. F. WHITE.

  "Address, Omaha, Neb."

And the answer alleged that this release was intended to and did cover all the plaintiff's claim in this action.

The plaintiff's reply denied all this answer except so far as it admitted matter in his petition; he alleged that the defendant's vice-president and general manager, White, represented to him that the defendant had a contract of insurance for the benefit of its employees; represented that the insurance company was required to and did pay for injuries received by defendant's employees, the amount of expenses incurred for medicine, doctor's service and hospital fees; stated that the $325 was not in payment of defendant's liability, but a payment to the employee regardless of the liability of defendant, and its receipt would be no discharge of the defendant; and stated further that such payment was simply to reimburse plaintiff for his expenses; alleged that White agreed to assist plaintiff to get a speedy and favorable settlement with the insurance

company, and agreed that in addition to whatever the latter should pay, defendant would in April following pay plaintiff $500, and give him employment so long as he saw fit to retain it; that at defendant's instance plaintiff went up to its office to meet the representative of the insurance company and make a settlement; that an agreement was entered into whereby the insurance company was to pay plaintiff $325 as his expenses incurred by reason of the injuries; that the insurance company's representative paid $325, and that said sum was received by plaintiff on account of expenses alone; that the question of damages was not discussed during the negotiations for the receipt; that plaintiff did not read the receipt, but the insurance company's agent pretended to read it and misread it so that from the reading and the representations plaintiff understood that it was simply a receipt for his expenses and had nothing to do with any claim for damages, and in reliance upon such understanding and representations he signed the receipt; that White, in promising that defendant should pay $500 and employ plaintiff, acted without authority and without intention on White's part to bind defendant, and without intention that defendant should pay plaintiff any such sum, and with intention to defraud and deceive plaintiff, who believed in and relied upon the honesty and good faith of White, and believed fully all the statements made by him, and was thus induced to sign said receipt without a personal examination of it; that at the time of signing such receipt he was suffering intensely with pain and ill with fever, not in his right mind, and in no condition to know what he was doing or to make a contract, and that he never did in fact agree to any settlement of his damages.

Under these issues trial was had, and verdict returned for $15,000. A motion for a new trial was overruled, and from a judgment on the verdict the defendant brings error.

Two briefs have been filed on behalf of the defendant company. The first, at page four, is summarized by its writer as follows:

"1. The company did not owe to the plaintiff the duty of inspecting the wires and making repairs in order that he might have a safe place to work at the place where this accident occurred.

"2. It was the duty of the plaintiff himself to observe the condition of the wires where he was working, and avoid contact with them and his failure to do so, shown by his own testimony, defeats a recovery.

"3. The court below erred in the fifth and eighth paragraphs of the charge, and in refusing to direct the jury to render a verdict for the defendant, on defendant's motion, upon the whole of the evidence."

The other brief states the claims of defendant as follows:

"1st. Assuming that the plaintiff was injured in the manner he describes, can it be said that his injuries were caused by the failure of the defendant to perform any duty it owed him as a regular lineman engaged in its service?

"2d. Assuming, again, that at the time of the accident the condition of the No. 4 wires was the same as the plaintiff found them in October following, was not the hazard incident to their condition, the same being open and obvious to even a casual and inexperienced observer, one of the assumed risks of the plaintiff's employment?

"3d. Assuming, again, that it was the duty of the defendant to have the wires properly taped before sending the plaintiff to work near them, and that it had neglected to perform this duty, was not the danger incident thereto an open and obvious one which the plaintiff was bound to see and guard against, and his failure to do so the proximate cause of his injuries?

"4th. Is the plaintiff not bound by the terms of the settlement, evidenced by the written release, signed by him?

"5th. Are not the damages excessive?"

Plaintiff contends, on page 7 of his brief:

"1st. That the evidence sustains the finding of the jury that the defective condition alleged was in existence at the time of the injury.

"2d. That the defendant is by law held to exercise ordinary and reasonable care to provide a safe place for its employees to perform their duties; that this reasonable and ordinary care required it to tape all splices and joints in insulated wires, and that in not having done so the defendant was guilty of negligence.

"3d. That plaintiff did not assume the risk of injury from contact with the untaped splices and joints, and in any event whether or not he did so was for the jury.

"4th. That it can not be said, as a matter of law, that plaintiff was guilty of contributory negligence in failing to see the untaped splices, and consequently whether or not he was guilty was for the jury.

"5th. The release signed by plaintiff was obtained by fraud and is not binding upon him so as to defeat a recovery."

It is clear from the examination of these briefs and from the record that the question in this case is upon the instructions. If the view of the law adopted by the trial court is sound, there is evidence to support the findings of the jury upon each disputed question of fact. These are practically two: First—Were the uninsulated splices on the wires July 1, 1898, and were they the cause of plaintiff's fall? Second—Was the receipt in full fraudulently obtained, and without an agreement for settlement?

As to the first, there is plaintiff's statement as to the manner of his fall; that he was doubled up by a severe shock, just as his shoulders were passing between these two wires, strong enough to draw his feet from the lower crossbar on which they rested. He also says that his right arm and the back of his left shoulder were burned by the electric discharge. As he went down between these wires with his face towards the pole, these exposed points, if they were then there, would strike him naturally at those places. He says that on October 1 or 2, after the accident, he went to the place and found the exposed splices. They seem to have remained there as late as the following spring. The attending physician testifies to the presence of burns ap-

parently from electrical contact, on plaintiff's shoulder and back, at his first examination after the accident. The line foreman for defendant testifies that he examined the place of the accident, with a view to ascertain its cause, immediately after it, and saw nothing of the splices and he thinks he would have seen them if they had been there. There is other testimony to the same effect. But the testimony goes to show that these splices were put on at some time to furnish electricity to a consumer, and when the service was discontinued the service wires were cut away leaving the splices and short projecting ends exposed. The plaintiff testifies that he had passed by this place and was acquainted with the line at that point, and during his employment with defendant there had been no service connection there. There seems to have been none afterwards, so far as the evidence shows. Defendant seems not to have attempted to show when the service wires were cut away, or the history of these splices in any way. It contents itself with denying that they were there on July 1, 1898. It would seem clear that there was evidence for the jury to consider as to whether or not the exposed points of these splices were there on July 1, and were the cause of plaintiff's shock. Defendant urges that the first positive evidence of their existence dates from October 1, three months after the accident, and that this is too remote to be considered. But where there is absolutely nothing to show that any service connection at this point had been either made or cut during that time, and plaintiff had been incapable of getting to the place sooner than that, there seems no error in admitting this evidence.

As to the other question of fact, defendant's counsel do not claim that there is no evidence of deceit on the part of its manager, White, and of the insurance company's agent, Gilbert. They do not claim that there is no evidence that the signing of the receipt in full was in consequence of such deceit. They say, however, that there was no fiduciary relation between plaintiff and either White or Gilbert; that plaintiff had full opportunity on his own story

to read the instrument, and if he did not do so, but negligently signed, he is estopped. They also claim that the evidence of plaintiff alone as to the fraud in procuring his signature to the receipt is not enough to overcome that of the paper itself, which was executed in duplicate, and the testimony of White and Gilbert in denial of his statements. It seems clear, however, that plaintiff was somewhat corroborated by other witnesses as to negotiations with White touching his expenses, and by the circumstances of the case. If the trial court was correct in telling the jury as to the effect to be given to the statements of White and Gilbert to plaintiff, if the jury should find them to have been made as plaintiff testified they were, then it must be conceded that the verdict—that this receipt constituted no valid defense—is supported by evidence.

The dispute therefore turns upon the instructions given by the trial court, and as to these the question is rather in reference to the application of principles, than concerning principles themselves, of law involved in the case. The question raised as to the sufficiency of the evidence of negligence on defendant's part turns upon the trial court's application of the doctrine of an absolute duty resting on the employer to make reasonable efforts towards providing a safe place for the employee to work.

The eighth instruction was in the following terms:

"It was the duty of the defendant company to exercise ordinary and reasonable care to render it safe for the plaintiff to work on its poles and among the electric-light wires. If such a degree of care and caution required said wires to be insulated, then it was negligence in the defendant to permit said wires, or a wire, or part of a wire, to be without proper insulation, and thereby subject its lineman to risk of injury; and if by reason of a want of such insulation a lineman, without fault on his part, suffers injuries, then the negligence of the company would be actionable and the injured lineman could recover proper damages."

This instruction told the jury that it was competent for them, if they concluded that "reasonable care" required defendant to insulate its wires, to find negligence from the simple fact that the wires were not insulated. A complaint is made that this instruction assumes as an established fact that the wires were not insulated when the accident happened. It is hardly open to this criticism. It, of course, assumes that the wires may not have been insulated, but does not, necessarily, assume anything more than that. The next instruction explicitly told the jury that, to recover, plaintiff must show by a preponderance of the evidence that the untaped splices were on the wires when he was hurt, and caused his shock and injury, and that the fact that they were found there some months afterward would not alone warrant a finding that they were there on July 1. This instruction 8 distinctly told the jury that if they thought reasonable care and caution on defendant's part required the taping of these splices, and plaintiff was hurt, without fault on his part, because they were not taped, he could recover. That is, the trial court held that it would not say that an absolute duty to insulate these wires at that point rested on the defendant, or that it did not so rest. It left the decision of that question to the jury, under the evidence. Counsel complain that the wording of the instruction led the jury to believe that the court meant to say that an absolute duty to insulate the splices rested on defendant. Such is not the meaning of the words, and if the distinguished counsel of defendant desired a clearer statement of the proposition they should have furnished it. In truth, their contention was then, and is now, that under the facts in this case, no duty to this plaintiff on defendant's part to insulate these wires existed. They said then, and say now, that defendant was relying upon plaintiff and his fellow linemen to do just this work of insulating, and, if he and they did not do it, they had no right to complain of the consequences. The evidence is that there were no inspectors of work of this kind other than the linemen and

their foreman. The latter testified that the duty of finding and repairing such defects rested upon the lineman who first went up the pole; that if any such defects were found the lineman should repair them at once, if he could, and if not, report them. Plaintiff testified that no duty of inspection rested upon him, but admitted that if he saw such a place his instructions were to tape it or report it, and that there were no inspectors of the line other than the linemen themselves. He also testified, as has been stated, that no work on the line at this point had been done while he was with the company. He stated, too, that these were the only untaped splices he ever found on the lines. There was no plea, and there is now no claim, that he was injured by a fellow servant's negligence. Under these circumstances the trial court left the question, as to whether plaintiff assumed the risk, to the jury, as he had done the question whether leaving the splices untaped was negligence on defendant's part. This was done by instructions numbers 5 and 6, as follows:

"When the plaintiff entered the employment of the defendant, he assumed all of the ordinary and usual risks incident to the work that he was hired to do; but he did not assume any risk of which he had no knowledge and which was due to the negligence of the defendant. In going about and performing his work, the plaintiff had the right to assume that the defendant had exercised reasonable care to furnish him a reasonably safe working place, and he was not required to suspect that the defendant had been guilty of negligence, or to make any such investigation or inspection as would be prompted only by the suspicion that the defendant had omitted to perform its duty.

"If you believe from the preponderance of the evidence that the plaintiff was injured as alleged in his petition, and that said injuries were the result of a risk usual and incident to the work of a lineman, and not to the negligence of the defendant alone, your verdict must be for the defendant; but if you do not find that his accident was

the result of a risk assumed by him when he engaged in said work as a lineman for the defendant, then you will proceed to examine the evidence and determine therefrom whether or not said accident is attributable to the negligence of the plaintiff or of the defendant, or both, or neither."

That is to say, the jury were told to determine whether this risk from these untaped splices was one which the plaintiff assumed when he undertook the work, and as to which he was expected to look out for himself, or whether it was, as he claimed, the only instance of uninsulated splices on the line and a risk which reasonable care on the defendant's part would and should have prevented.

Plantiff urges that assumption of the risk by him is not pleaded, and cites *Union Stock-Yards Co. v. Goodwin,* 57 Neb. 138. That case holds that the company could get no advantage from assumption of risk on Goodwin's part by his continuing to work with knowledge of a rule that loaded cars were to be taken to the chutes without inspection, because no such assumption of the risk was pleaded. It is contended that in this case the only issues raised are denial of the untaped splices and settlement, and that no assertion is made that plantiff assumed the risk. No exception, however, was taken by plaintiff to instruction 5, and it is clear that the trial was conducted by both parties under the theory that the plaintiff assumed the ordinary risks incident to his employment, and that these could be shown. The jury, however, found that this one from untaped splices was not among them, but was the result of his employer's neglect. The trial court evidently took the view that it was at least possible for impartial and reasonable jurors to take the view that the exposed conditions of these wires was due to the employer's neglect of the proper precautions for the employee's safety, and that the latter had no knowledge of any such danger from an untaped splice, and therefore did not assume it. To the contention of defendant that because it was plaintiff's duty to look for this defect and

remedy it, therefore he is chargeable with knowledge of it and assumed all risk from it, the reply is that the evidence does not show any such duty of inspection; that plaintiff is simply a lineman; and that the most which the evidence shows is that he was charged with the duty of repairing or reporting structural defects which came under his observation. We are not prepared to say that, under this evidence, the trial court was wrong either in leaving to the jury the question as to whether exposed splices might constitute negligence, or in submitting the question as to plaintiff's assuming the risk.

The question as to contributory negligence is urged at length. Defendant claims that these exposed splices constituted so obvious a danger upon two wires, which the lineman must have known, from the fact that they were both spliced, to be corresponding positive and negative wires of a circuit, that to go between them without any attention to the insulation was foolhardiness. It appears that the linemen were instructed as to the danger of a "short circuit" between positive and negative wires, but it does not clearly appear that there was anything unusual or out of the ordinary in the manner in which plaintiff in this instance performed his work. If the exposed splices were there on July 1, they seem to have escaped the foreman's notice when he was looking for the cause of the accident. There was some testimony tending to show that different wires were paired as positive and negative at different times, and that the workmen depended upon the insulation.

Counsel for plaintiff claims that there is no pleading of contributory negligence, and therefore, if there was any, it can not avail the defendant. In this again we find that counsel took no exceptions to the instruction in which this question was submitted to the jury. They treated this answer, with its allegations of plaintiff's negligence and denial of any on defendant's part, as a plea of contributory negligence, and permitted the court to so instruct without exception. They can not now claim this issue is not in the

case. If the evidence of his starting down between these wires, with the exposed splices there, is conclusive proof of contributory negligence on plaintiff's part, he ought not to recover, and the court should have so instructed the jury. The question, however, was left to the jury.

It is complained that there was error in telling the jury, in the seventh instruction: "Neither negligence nor contributory negligence can be presumed. Whoever alleges that another was guilty of negligence or contributory negligence must establish it by a preponderance of the evidence, or fail in his action or defense."

It is claimed that this omits a feature present in this case, namely, that a party's own evidence may show contributory negligence. But by instruction No. 11 the court told the jury: "If plaintiff's own testimony tends to show that he was guilty of carelessness which caused or aided in causing his injuries, then the burden shifts and it devolves upon the plaintiff to satisfy you by a preponderance of the evidence that he was not guilty of contributory negligence."

Is seems to be conceded that if these were in one instruction they would together correctly state the law. It is thought that they must be considered together. If their effect, when so taken together, is to correctly submit the issue of contributory negligence, the placing of them in separate paragraphs can hardly have been prejudicial. It is thought that the trial court was right in refusing to say, as a matter of law, that the proof showed contributory negligence, and that defendant can not justly complain of the manner in which the instructions submitted this question.

It remains to consider the questions raised as to the settlement, and to excessive damages. The settlement seems to have been the hardest contested matter at the trial. In regard to this, defendant's manager, White, and Gilbert, the insurance company's western agent, both denied plaintiff's statement, and it is insisted now that the receipt, backed by their testimony, is conclusive against

plaintiff. The right of plaintiff to have this question sub-
mitted to a jury on the trial court's view of the law has
been indicated. The court refused an instruction in these
terms: "If you find from the evidence that plaintiff had
the capacity to read the release signed by him in duplicate
and that Gilbert pretended to read same to plaintiff,
though you believe Gilbert in fact misread said release,
yet if before plaintiff signed it the plaintiff had an oppor-
tunity to read it, but nevertheless chose to rely upon what
Mr. Gilbert told him about its contents, the plaintiff
is estopped by his own negligence from claiming that said
release is not legal and binding upon him according to its
terms."

The instruction actually given was as follows: "If you
find from a clear preponderence of the evidence that the
paper offered as a release does not correctly recite the
settlement that was in fact made between the plaintiff and
Mr. White or Mr. Gilbert, or both; and if you further find
that the settlement really made was limited to the matter
of doctor's bills and hospital expenses, and that the plain-
tiff was induced to sign such release by its being misread
to him in such a way as to cause him to understand and be-
lieve that it was a receipt only to an insurance company
for money paid on account of his hospital expenses and
doctor's bill, and not on account of his injuries generally,
and if such misreading was done for the purpose of de-
ceiving him, and procuring his signature to a paper which
was contrary to the settlement he was making, the plaintiff
would not be bound by such receipt. If you find that said
release is not binding on the plaintiff, then you will pro-
ceed to a consideration of the evidence with respect to the
charge of negligence made against the defendant; but if
you find that said release truly states the settlement that
was made when the receipt was signed, then you need pro-
ceed no further in the consideration of the case, but should
return a verdict for the defendant."

As before stated, unless plaintiff is to be held to have
been under a duty to read this paper and so inform him-

self as to its contents, and to be estopped from denying
its validity inasmuch as he did not do so, there is evidence
that should go before the jury. Upon this question of es-
toppel by reason of failure to read the release defendant
cites and relied upon *Wallace v. Chicago, St. P. M. &
O. R. Co.,* 67 Ia. 547, 25 N. W. 772. The instruction,
which in that case the court says should have been given,
does bear a considerable analogy to the one tendered
at the trial of this case. It, however, wholly omits the
misreading to induce signature, charged in the present
case and mentioned in the instruction here given. The
court in the Iowa case expressly says of the plaintiff (p.
550) : "He does not claim that he requested the instru-
ments to be read to him, and that the contents were pur-
posely misrepresented in the reading, or that he was de-
ceived by any sleight of hand, legerdemain, or artifice."
In the present case the court was asked to say, as a matter
of law, that plaintiff, because he could read, had the op-
portunity to read it and did not, but relied upon the other
party, was estopped to deny the effect of an instrument
which he claimed, and has some corrobaration in claiming,
did not represent the agreement he had made, and which,
he says, was intentionally misread to him to procure his
signature. We hardly think it can be pronounced error
to tell the jury that if they found the plaintiff's allegations
supported by a clear preponderance of the evidence, the
receipt was not binding.

*Upton v. Tribilcock,* 91 U. S. 45, 23 L. ed. 203, cited
by defendant, was a case of suit by an assignee against a
stockholder for unpaid portions of the capital stock. As
against the creditors, the taking of the stock upon fraud-
ulent representations was held to fix the liability, unless
the contract had been seasonably repudiated and the stock
tendered back on rescission. Upon the latter question, it
was held that plaintiff had a right to the opinion of the
jury.

In *Woodbridge v. DeWitt,* 51 Neb. 98, 100, this court
says: "It is elementary that where a contract is reduced

to writing, parol evidence is not admissible to contradict it or vary its terms. It is also true that a party can not generally avoid the effect of a written instrument by showing that he signed it without reading it or in ignorance of its terms, but he may avoid it for fraud. The general rule referred to is not applicable in a suit between the original parties to the contract, where the defense is that the writing, by reason of fraud, does not embrace the contract actually made." The third paragraph of the syllabus of the same case says that there is no estoppel where fraud is resorted to "in order to induce the other to sign without reading." If a "clear preponderance of the evidence" in the present case, as the jury found, shows that this writing did not represent the contract made, and that it was misread to plaintiff by those procuring it for defendant, the conclusion seems inevitable that it was done to induce him to sign without reading. The jury was told that the evidence must show "by a clear preponderance" that it was for this purpose.

A contention is made, but apparently not with great confidence, that the $325, which was paid on the settlement, should be returned. The trial court instructed that if the settlement was void the $325 must be credited upon the damages. If the fraud was established, and plaintiff's claim was found to exceed the sum paid, this seems to make a just application of the money. As counsel for plaintiff say, the settlement admitted to have been made of the expenses, is not sought to be impeached. It would seem that only the writing, so far as it embodies a settlement of damages, is attacked, and no obligation to restore the $325 rested upon plaintiff. *Missouri P. R. Co. v. Goodholm,* 60 Pac. (Kan.) 1066; *O'Brien v. Chicago, M. & St. P. R. Co.,* 89 Ia. 645, 657.

It is urged that the damages are excessive, and so much so as to show passion and prejudice on the jury's part. Cases are cited in which, for loss of a foot, awards somewhat smaller than this one have been held excessive and remittiturs ordered. Other cases are cited by plaintiff

where the award for the loss of a foot was larger than in this case and was yet sustained. In this case both feet were injured, the right one was amputated nearly eleven months after the injury and after much suffering. The plaintiff was 33 years of age, and earning $65 monthly at his employment. It can not be said that the amount alone of this verdict is such as should absolutely set it aside. It is true that for a slightly smaller sum an annuity to the full amount of plaintiff's former earnings could be obtained, and his present earning capacity must be something. On the other hand, his sufferings have undoubtedly been great and their value can not be adequately measured. We have no measure which we can apply to determine that any reduction should be made in these damages. If the findings that there was negligence of the defendant, no contributory negligence of plaintiff, no assumption of the risk and no settlement of damages, are all sustained, it would seem that the judgment should be affirmed.

It is recommended that the judgment of the district court be affirmed.

KIRKPATRICK and LOBINGIER, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

THE following opinion on rehearing was filed January 6, 1904. *Judgment below reversed:*

1. Employer: EMPLOYEE: REASONABLE CARE IN INSURING SAFETY OF LATTER. Ordinarily, in providing his employees with a place to work, or tools and appliances with which to work, an employer is bound to exercise reasonable care to insure the safety of such employees.

2. Continuing Duty. The foregoing duty is a continuing one, and the employer is also bound to keep such place, tools and appliances in a reasonably safe condition, and to make seasonable inspection with that end in view.

3. Duty Devolving Upon Employee. But where, from the nature of

the work, the contract of employment, or other facts and circumstances, the duty to make inspection and discover defects devolves upon the employee, the employer is not liable for an injury resulting to such employee from a defect which the latter, by reasonable inspection, would have discovered.

4. **Instruction.** An instruction which, in effect, directs a finding on an issue upon which the evidence is conflicting, is erroneous.

ALBERT, C.

This case is before us on rehearing. The former opinion is reported *ante* p. 54, and contains a statement of the issues and of the questions presented for review. By reference to that opinion it will be seen that the defendant is a corporation, and maintains a system of wires for the purpose of carrying electricity for lighting and other purposes; that the action is for damages for personal injuries sustained by the plaintiff while in the employ of the defendant, and in the course of his employment as a lineman; that the injuries were occasioned by his coming in contact with the ends of spliced wires, which ends, it is alleged, were not insulated. Negligence is the gist of the action, and the negligence upon which the plaintiff bases his right to recovery is the omission of the plaintiff to insulate the ends of the wires with which he came in contact.

We are satisfied with the conclusion reached in the former opinion upon every question, save that relating to the eighth paragraph of the charge to the jury, which is as follows: "It was the duty of the defendant company to exercise ordinary and reasonable care to render it safe for the plaintiff to work on its poles and among the electric light wires. If such a degree of care and caution required said wires to be insulated, then it was negligence in the defendant to permit said wires, or a wire or part of a wire, to be without proper insulation, and thereby subject its linemen to risk or injury; and if by reason of a want of such insulation, a lineman, without fault on his part, suffers injuries, then the negligence of the company would be actionable and the injured lineman could recover proper damages."

It is undoubtedly a general rule of law that the employer is bound to exercise reasonable care not to expose his employees to unreasonable or extraordinary danger by putting them to work in dangerous places or with dangerous tools and appliances. 2 Thompson, Negligence, 972; Wood, Law of Master and Servant, sec. 398. This rule not only makes it the duty of the employer to provide suitable tools and appliances in the first instance, but also to use all reasonable care in keeping them safe and serviceable, and to make seasonable inspection of the condition thereof with that end in view. *Union Stock-Yards Co. v. Goodwin,* 57 Neb. 138; *Brann v. Chicago, R. I. & P. R. Co.,* 53 Ia. 595, 36 Am. Rep. 243; *Ford v. Fitchburg R. Co.,* 110 Mass. 240; *Shanny v. Androscoggin Mills,* 66 Me. 420; *Solomon R. Co. v. Jones,* 30 Kan. 601; *Chicago & N. W. R. Co. v. Jackson,* 55 Ill. 492, 8 Am. Rep. 661. The foregoing rule is subject to many qualifications and exceptions, one of which is that where, from the nature of the work, the contract of employment, or other facts and circumstances, it is the duty of the employee to make inspection and discover defects in the tools or appliances furnished him, the employer is not liable for an injury resulting to such employee from a defect which the latter, by reasonable inspection, could have discovered. *McGorty v. Southern New England Telephone Co.,* 69 Conn. 635, 61 Am. St. Rep. 62; 20 Am. & Eng. Ency. Law (2d ed.) 142, and cases cited. In other words, under such circumstances, it is no longer the duty of the employer to protect the employee against such defects, but of the latter to protect himself.

One of the theories of the defense in this case, abundantly supported by the evidence, is that it was a part of the duty of the plaintiff as a lineman, from the nature of his work, his contract of employment, and the facts and circumstances in the case, to inspect the wires, among which he worked, for defects and imperfections, including such defects as those alleged to have caused the injury in question; that a reasonable inspection would have disclosed

such defects; and that he failed to make such inspection. In other words, one of the issues of fact in the case is whether it was the duty of the defendant to protect the plaintiff from the defects in question, or whether that duty devolved upon the latter himself. The instruction referred to is to the effect that such duty devolved upon the defendant, and amounted to the direction of a finding against the defendant on that issue. That, in view of the evidence, which, to say the least, is sufficient to entitle the defendant to the submission of that issue to the jury, is erroneous. We have not overlooked the qualification in the instruction that the injury must have been without fault on the part of the plaintiff. But it is obvious, we think, that this was not intended to qualify or limit the duty imposed upon the defendant by the first sentence, but rather to cover the theory of contributory negligence. As thus qualified, the instruction still assumes that the duty devolved upon the defendant, which was one of the questions for the jury.

We have examined the other instructions in this case, especially those relating to contributory negligence and the assumptions of risks by an employee, and find nothing that would warrant us in holding that the error hereinbefore pointed out is cured by any other portion of the charge.

The plaintiff contends, however, that the defects in question were in the original construction of the line, and were not such as the plaintiff could be expected to look for or discover. But the evidence is amply sufficient to sustain a finding that it was the duty of the linemen to look for and discover, not only defects which arose from accident or wear and tear, but defects of every character, including those in the original construction. Hence, whether the defects which caused the injury were in the original construction, or originated afterward, is immaterial for present purposes.

It is recommended that the former judgment of this court be vacated, that the judgment of the district court

be reversed, and the cause remanded for further proceedings according to law. ·

BARNES and GLANVILLE, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the former judgment of this court is vacated, the judgment of the district court is reversed, and the cause remanded for further proceedings according to law.

REVERSED AND REMANDED.