## Missouri, Kansas & Texas Railway Company of Texas v. Sallie Jones et al.

### Decided April 23, 1904.

**1.—Railroads—Injury to Employe—Charge—Pleading and Evidence.**

A charge that it is the duty of a railway company's servants who operate its engines along a portion of its track that is commonly used by its employes, or over and about which its employes commonly pass in the discharge of their duties, to exercise ordinary care in keeping a lookout to discover the presence of such employes on or in close proximity to the track at such point, and to use all means in their power consistent with the safety of the engine and its operatives, to stop the engine to prevent a collision with or injury to such employes,—held warranted by the pleading and evidence disclosed in the opinion, and to announce a correct principle.

**2.—Same—Duty to Stop Not Made Absolute.**

Such charge did not make it the absolute duty of those operating the engine to stop it on approaching a place in the track commonly used by the employes, but to use all means in their power to prevent injury to them.

**3.—Same—Assuming Deceased Not Guilty of Negligence.**

A charge held not to assume that the deceased was not guilty of negligence in slipping and falling and being in the railway track at the time he was injured,—the charge requiring the jury to believe that he was exercising ordinary care for his own safety at the time, and being followed by a special charge, given at defendant's request, instructing that the burden of proof was on plaintiffs to show that the deceased was free from negligence.

**4.—Same—Intoxication Precluding Recovery, When.**

The intoxication of the deceased at the time of the injury would not, of itself, preclude a recovery for causing his death, since, to have that effect, the intoxication must have contributed to or proximately caused his injuries. See charges held to correctly present that issue.

**5.—Same—Assumed Risk Must Be Pleaded.**

Where the defendant had not pleaded assumed risk, it was not error for the court to refuse to submit that issue to the jury.

**6.—Evidence—Res Gestae.**

Where deceased was run over by an engine, dying three hours afterwards, and within five minutes after the injury, and while he was still lying on the track, a conversation occurred between him and the man who was in charge of the engine as to why the latter did not see the deceased on the track in front of the engine when he could have seen him, such conversation was admissible as res gestae.

**7.—Same—Expert Evidence—Engineer.**

A witness who had had fourteen months' experience as an engineer was competent to testify as to the distance ahead at which one operating an engine can see an object on the track.

**8.—Verdict Held Not Excessive—Action for Death.**

A verdict for $10,416, for negligently causing the death of a colored coal heaver, 32 years of age and earning $45 per month, held large, but not so large as to show that it was the result of passion or prejudice on the part of the jury.

Appeal from the District Court of Hunt. Tried below before Hon. H. C. Connor.

*T. S. Miller* and *Perkins, Craddock & Wall,* for appellant.

*Bennett & Jones,* for appellees.

BOOKHOUT, Associate Justice.—On the 19th of March, 1903, Sallie Jones instituted this suit against the appellant for herself and in

behalf of her minor children, Annie, Pearline, Lennie and A. G., to recover damages on account of the death of Jack Jones, who was her husband, and the father of the said minor children. The defendant answered by a general demurrer, general denial and a special answer of contributory negligence in that the deceased, Jack Jones, was intoxicated at the time he was injured and killed, and that by reason of intoxication he stepped or fell immediately in front of the engine or fell underneath one or more of the wheels of the tender by the side thereof and was run over and killed. A trial resulted in a verdict and judgment for plaintiffs for $10,416, and defendant appealed.

*Conclusions of Fact.*—For the purpose of coaling its engines in Greenville the appellant used a platform about fifteen feet wide and perhaps 100 or more feet long, and about the middle of this platform was situated a derrick or hoist operated by air which was supplied by the engine being coaled. The derrick consisted of three upright pieces on the platform, the center piece being designated as the crane, hoist or "horse." At the top of this hoist were arms extending in each direction, to which the buckets of coal were attached, and then the arms revolved so as to carry the coal from over the platform to the tender of the engine, where it was dumped. This coal platform was parallel with appellant's main track, which was situated just west of the platform. The air or lifting power was conveyed from the engine to the hoist by means of a hose which would be attached at one end to the train line hose at the rear end of the tender being coaled after the same was stopped at the proper place, and at the other end to a pipe running along the west side of the platform communicating with and constituting a part of the machinery of the hoist, said pipe extending equal distances on each side of the middle upright piece. If an engine were headed south the hose would be attached at the north end of this pipe, but if headed north it would be attached at the south end of the same. Just north of this platform was situated the sand house or place where the engines were supplied with sand; north of that a short distance was situated the inspector's office, and north of that across Henry Street was situated the flagman's shanty. The coal platform was three or four feet high, and it was about thirty steps, or ninety feet, from the sand house to the place where the engines were coaled. The hose would always be attached by one of the colored coal-heavers who worked on the platform.

C. B. Lyle was the hostler and in charge of defendant's engine No. 192. This engine and its tender was backed up from defendant's round-house, which was situated about 300 yards south of the coal chute, along appellant's main track by the coal chute to the sand house for the purpose of having the sand box filled. After it was sanded it was moved south over the same track to the coal chute to take coal. It was moving about two miles per hour and had its headlight burning. About this time Jack Jones, the deceased, who was on the platform of

the coal chute, jumped down by the side of the track to attach the hose to the tender. It was the duty of Jack Jones to attach this hose. There was coal on the ground by the side of the track and this caused him to slip and fall across the track. He was run over and injured, from which death resulted. In addition to the light furnished by the headlight of the engine, Jack Jones' lighted torch was sitting on the platform near where he jumped therefrom. There was also a burning torch hanging on the coal chute about as high as a man's head.

In deference to the verdict we find that the employes of defendant operating the engine did not use ordinary care to keep a lookout for persons on the track, and that in this respect they were negligent, and that such negligence was the proximate cause of the injuries to Jack Jones; that had a proper lookout been kept by said employes they could and should have discovered Jack Jones upon the track in time by the use of the means at their command to have stopped the engine and averted injuring him; and that Jack Jones was not guilty of contributory negligence, and by his death appellees have suffered damages in the amount found by the jury.

*Opinion.*—Complaint is made of the following paragraph of the charge of the court: "It is the duty of a railway company's servants who operate its engines along a portion of its track that is commonly used by its employes, or over and about which its employes commonly pass in the discharge of their duties, to exercise 'ordinary care' in keeping a lookout to discover the presence of such employes on or in close proximity to the track at such point, and to use all the means in their power, consistent with safety of the engine and its operatives, to stop the engine to prevent a collision with or injury to such employes."

The contention is that this charge is not warranted by the pleadings, and that there is no evidence that the deceased was ever in a position in close proximity to the track where he might have been seen by those on the engine, or where it would become the duty of those on the engine to see him and stop the engine. The petition did charge that the "agents and servants of appellant operating its engines at said point might reasonably and at all times anticipate or expect the presence of persons on said portion of said track, or in dangerous and perilous situation in close proximity thereto, and that appellant knew, or by the exercise of ordinary care could have known, that the operation of its engines at said point was attended with great peril and hazard to the lives and safety of its employes working in said yards, and on and around said coal chute."

C. B. Lyle, the hostler in charge of the engine, testified that "I knew the coalheavers worked there all the time. I knew that they had to get off of the platform to connect the hose. The coalheavers working there were bound to be there somewhere. I knew that they were in the habit of getting down just before he engine got there,' just ahead of the engine."

The charge complained of announced a correct principle, and we think the issue presented was fairly raised, both by the pleadings and evidence.

Nor is this charge subject to the criticism that it makes it the duty of the operatives of the engine, when approaching at a place where the track is commonly used by the employes, to stop the engine in order to avoid injuring such employes. The only construction which the jury could have placed upon the charge was that it made it the duty of the operatives of the engine to use ordinary care to keep a lookout to discover employes of the railroad upon or in close proximity to the track, and if the employes were discovered in such position, to use all means in their power to prevent injury to them. It is not made the absolute duty of those operating the engine to stop it on approaching a place in the track commonly used by the employes.

The following charge is also assigned as error: "Now if you believe from the evidence, under the foregoing rules of law, that on February 11, 1902, Jack Jones was in the employ of the defendant, in its yards in Greenville as coalheaver; and if you believe on said date one of the defendant's engines was approaching on the main line on the west side of the coal chute from the north, at a low rate of speed, to wit, about two miles an hour, for the purpose of taking coal at the coal chute; and if you believe Jack Jones went to jump down from the platform of the coal chute to be ready to attach to said engine its air hose used in coaling engines; and if you believe in attempting to jump from said platform (if he did) he slipped and fell on the track in front of the engine; and if you believe in attempting to jump from said platform, if he was, he was in the discharge of his duties; and if you believe he was exercising ordinary care for his own safety; and if you believe that said engine ran over and killed the said Jack Jones; and if you believe the said Jack Jones was run over by said engine at a point on the defendant's track that was commonly used by the defendant's employes, or over and about which its employes commonly passed; and if you believe that the servants of the defendant in charge of said engine could, by the exercise of 'ordinary care' in keeping a lookout, have seen the said Jack Jones fall on said track, if he fell thereon, in time, by using the means in their power, to have prevented his injury and death; and if you believe that said servants failed to keep such lookout, that is, failed to keep such lookout to discover employes on or near the track, as persons of ordinary prudence would have kept under the same or similar circumstances; and if you believe their failure to keep such lookout (if they failed) was the proximate cause of Jack Jones being run over and killed, then you will find for the plaintiffs."

The criticism made to this charge is that it assumes that Jack Jones was not guilty of negligence in slipping and falling and being on appellant's track at the time he was injured, whereas his conduct in this respect was an important issue which should have been left to the determination of the jury. We are of the opinion that the main charge

does not assume that Jack Jones was not guilty of negligence in slipping and falling and being upon appellant's track.

This charge required the jury to believe that Jack Jones was exercising ordinary care for his own safety in attempting to jump from the platform. In this connection the court, at the request of defendant, instructed the jury as follows: "The burden of proof is upon the plaintiff to show from the surroundings and circumstances leading up to the accident what the deceased was doing, and that he was free from negligence, as that term is defined in the main charge of the court, and that the defendant's servants in charge of the locomotive were negligent as that term is defined in the main charge of the court, and that such negligence on the part of the servants was the proximate cause of the death of the deceased." The special charge quoted clearly requires the jury to find that deceased was free from negligence.

In its seventh assignment of error complaint is made of the following charge: "Or if you believe from the evidence that the said Jack Jones at the time of the accident was intoxicated, or in a state of intoxication; and if you believe that because of such intoxication he slipped and fell in front of or underneath one or more of the wheels of said engine; and if you believe that he was guilty of negligence in being intoxicated or in a state of intoxication (if you find he was) at said time and place; and if you believe such negligence, if any, caused or contributed to cause his injury and death, then, in that event, you will find for the defendant; but if you find that said Jack Jones was intoxicated or in a state of intoxication, that would not defeat a recovery unless you further believe that the same was negligence and that such negligence caused or contributed to cause the injury."

Appellant contends that the real issue for the determination of the jury was whether or not his intoxication caused him to do or fail to do anything which a man of ordinary care and prudence would have done or failed to do, and it was erroneous for the court by this charge to lead the jury away from such issue by instructing them that the intoxication of deceased would not defeat a recovery unless his intoxication was negligence.

The intoxication of Jack Jones, if he was intoxicated, in itself would not preclude a recovery by plaintiffs, but the same must have contributed to or proximately caused his injuries. The jury were told by this charge that if Jack Jones was intoxicated, or in a state of intoxication, such condition would not defeat a recovery unless they believed the same was negligence and caused or contributed to cause the injury. The jury could not have been misled by this charge. The court gave at the request of defendant on this issue the following special charge: "If you believe from the evidence that at the time of the accident Jack Jones was in a state of intoxication, and that such state of intoxication placed him in such a condition that he was unable, and failed, to exercise the caution and care required of him under the general instructions of the court heretofore given you; and if you further believe that by

reason of such condition he was injured, then in that event the plaintiffs can not recover."

We are of the opinion the charge complained of, when construed in connection with the special charge quoted, fairly submitted the issue of contributory negligence resulting from intoxication. The only negligence pleaded by appellant as constituting contributory negligence on his part was that arising from his intoxication, and the issue raised by this plea having been fairly submitted, and the charge further requiring the jury to find that Jack Jones was exercising ordinary care for his own safety in attempting to jump from the platform, there was no error in refusing the special charge number 13, seeking to have such issue again submitted.

It is insisted that the court erred in refusing to give at the request of defendant a special charge submitting the issue of assumed risk. The defendant had not plead assumed risk on the part of Jack Jones, and for this reason the trial judge refused to give a charge submitting the issue. The burden, as we understand it, is upon defendant to allege and prove that the servant had knowledge of the manner of performing the work in the performance of which he was injured, and of its dangerous character, and assumed the risk thereof. Having failed to plead assumed risk, the court properly refused the special charge. International & G. N. Ry. Co. v. Harris, 95 Texas, 346. The charge of the court, taken as a whole, fairly submitted the issues in the case, and there was no error in refusing the several special charges, the refusal of which is complained of in various assignments of error.

It is contended that the court erred in admitting the testimony of the witness Jack Smith as to what was said by him and by hostler Lyle, and the deceased, Jack Jones, upon their discovering that Jack Jones had been injured. While Jack Smith was testifying in behalf of plaintiff he was asked by plaintiff's attorney this question: "Now, Jack, tell all that was said then; all that was said by Jack Jones and the rest of you." Upon objection being made the jury were withdrawn from the court room and witness stated that his answer to the interrogatory would be as follows: "When I came around where Jack Jones was I asked him how he happened to get caught. Jack said 'he went to jump down, and that there was coal under his feet and he slipped and fell, and before he could get up the engine caught him.' I asked Mr. Lyle, the hostler, what he was doing, and he said 'Lord, I would not run over you [meaning Jack Jones] for anything. I did not see you.' Jack Jones said, 'I do not see why you did not see me.' Mr. Lyle said, 'I was monkeying with my ticket.'" The defendant's counsel objected to the answer to said question on the ground that the same was no part of the res gestae and was hearsay. The objection was particularly urged to the statement by Jack Jones, "I don't see why you didn't see me," and the reply of Mr. Lyle thereto, that 'I was monkeying with my ticket."

The court overruled the objections, and, the jury being recalled, the

witness answered said question as above set forth. The conversation was had and the statements made within five minutes after the accident and while Jack Jones was lying upon the ground on the west side of the track between the trucks at the back end of the tender. At the time he was suffering great pain. It was about 12:30 o'clock in the morning. He died about three hours thereafter, as a result of his injuries. The circumstances under which these statements were made clearly show there was no intention to misrepresent the truth of the occurrence. The statements were res gestae and were admissible. San Antonio & A. P. Ry. Co. v. Gray, 95 Texas, 424, and authorities there cited.

The court did not err in permitting the witness Joe Postlewait to testify in substance that he could see an object on the track from one to ten feet in front of an engine in operating the engine at the rate of two or three miles per hour. The witness had had fourteen months' experience as an engineer and showed his competency to testify as to the distance an object could be seen on the track by the engineer while operating the engine.

Complaint is made that the verdict and judgment are not supported by the evidence and are against the great weight and preponderance of the evidence; and further that the same are excessive. There was sufficient evidence to justify the jury in finding the verdict they did. The deceased was 32 years old when killed, and was earning $45 per month. He was an industrious, healthy, able-bodied man, with a life expectancy of 33.93 years. His wife, Sallie Jones, is 28 years old, and his four children are of the respective ages of one, four, seven and ten years. The verdict is large, but we can not say that it is so large as to show that it was the result of passion or prejudice on the part of the jury. Missouri P. Ry. Co. v. Lehmberg, 75 Texas, 61; Galveston H. & W. Ry. Co. v. Lacy, 86 Texas, 244; Ft. Worth & D. C. Ry. Co. v. Morrison, 93 Texas, 527; San Antonio & A. P. Ry. Co. v. Parr, 26 S. W. Rep., 861.

Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*