LAURA W. GRIMM, ADMINISTRATRIX, APPELLEE, V. OMAHA
ELECTRIC LIGHT & POWER COMPANY, APPELLANT.*

FILED JUNE 22, 1907.    No. 14,856.

1. **Electricity: NEGLIGENCE.** An electric light company placed its wires through the branches of trees so that high potential wires charged with 2,300 volts of electricity were within 26 inches of low potential wires. It was undisputed that proper construction required such wires to be at least five feet apart, and, even when so placed, should not be permitted to pass through the branches of trees, thereby endangering contact. *Held*, That the company was guilty of negligence as a matter of law, and that errors in submitting the question to the jury were without prejudice.

2. **Master and Servant: INJURY: NEGLIGENCE.** *Held*, That plaintiff's intestate was killed while in the performance of duties within the scope of his employment.

3. ———: ASSUMPTION OF RISK: NEGLIGENCE OF MASTER. A servant by his contract assumes the ordinary risks and dangers incident thereto, but does not assume the risk of dangers due to his master's negligence.

4. ———: ———: CONTRIBUTORY NEGLIGENCE: QUESTION FOR JURY. Plaintiff's intestate, a lineman, was sent by his superior to ascertain and remove the cause of an electrical disturbance at the residence of one of the company's patrons. It was undisputed that deceased knew that the patron's son had received a shock from one of the electric lights in the dwelling, and that the wires in the yard were causing trees to which they were attached to smoke. Deceased assisted in removing the wires in the yard, and then went into the residence, and later asked to be shown the light from which the son had received the shock. Upon it being pointed out to him, he took hold of it with his hand, and was instantly killed. *Held*, That whether deceased assumed the risk and was guilty of contributory negligence were properly left to the determination of the jury.

APPEAL from the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Affirmed.*

*Greene, Breckenridge & Kinsler,* for appellant.

*James M. Macfarland* and *Weaver & Giller, contra.*

* Rehearing allowed.  See opinion, p. 395, *post.*

EPPERSON, C.

Dundee is a village situate immediately west of the city of Omaha. Forty-Ninth street runs north and south through the village, intersecting Davenport street at right angles. The wires of the Omaha Electric Light & Power Company extend along the east side of Forty-Ninth street. There were two wires, a primary or high potential wire carrying 2,300 volts of electricity, and a secondary or low potential wire carrying 106 volts. The high potential wires were on four-pin arms near the top of the poles, and the low potential wires on two-pin arms about 26 inches lower down. The poles were placed so that wires passed through the crown of trees along Forty-Ninth street. At Forty-Ninth and Davenport streets the power company constructed a transformer, and strung a secondary wire from the transformer east along Davenport street to the residence of W. L. Selby. In this manner the company supplied Selby with electricity. Selby's yard, as well as his residence, had been wired and was provided with electric lights. These lights were connected with those in the house and controlled by switches in the dwelling. August 29, 1904, about 7:30 A. M., Selby observed a disturbance among the wires in his yard, and noticed that the trees to which the wires were attached were smoking and sparks were flying from the fixtures. He requested his son, Frank Selby, to go to the switch in the cellar and cut the current. Frank proceeded to the cellar, but could not see the switch. Thereupon he attempted to turn on an incandescent light. The instant he took hold of the button he received a severe electric shock. After Mr. Selby learned of the accident to his son, he telephoned Wesley Morrison, an independent electrician who had wired the yard, and also called up the company, and notified it that the trees were burning in the yard, and that his son had sustained a shock. Upon receiving this report, George Keebler, as foreman of the power company, directed James C. Grimm, one of the defendant

company's employees, to immediately proceed to Dundee, and investigate and remove the trouble complained of, stating to Grimm that the information had been received from Selby's at 4808 Davenport; that in all probability there was a cross between the primary and secondary wires on Forty-Ninth street; that he should look carefully along Forty-Ninth street as the trees were pretty thick there; and that the trouble in all probability would be found at that point. Morrison reached the premises first. When he observed the trees smoking, it occurred to him that there was a "ground," and he went into the house and cut the current from the yard lights. Upon his return, he began cutting down the wires in the yard. While thus engaged, Grimm came up and began to assist in removing the wires. After this work was completed, Mrs. Selby called to them to investigate the wiring in the house. The two men went in, and Morrison began working on a switch, while Grimm stood by watching him. Frank Selby was in the room, and Grimm asked him to show him the light in the cellar where he had received the shock. Frank testified: "When we got down cellar, I walked right around the switch to the west, and pointed at it with my finger, and said, 'That's the one,' and he (Grimm) walked right around to the south, and said, 'Is this the one?' and then he grabbed it," and was instantly killed. An investigation disclosed that the company's wires had "become tangled together" in the trees along Forty-Ninth street, and that the high potential wires and the low potential wires were in contact, thus causing 2,300 volts of electricity to be carried along the secondary wire to the Selby residence.

The plaintiff, Laura W. Grimm, as administratrix, sued the power company and recovered $5,000 damages for the death of her husband, James C. Grimm. The negligence relied upon is that the power company negligently and carelessly constructed the electric wiring leading to the residence of W. L. Selby so that the high potential wires and the low potential wires ran along so close together that they became at times crossed, and negligently ran

said wires through the limbs of trees so that the high currents were carried upon the low current wires, and in that way conducted into the residences; and that said defendant negligently and carelessly maintained, and continued to maintain, said faulty construction and arrangement of said wires up to and including the time said James C. Grimm was killed. The power company alleged as a defense, and now urges as grounds for reversal, (1) that the company was not negligent; (2) that plaintiff's intestate was working outside of his employment at the time of the fatal shock; (3) that the accident was one of the assumed risks incident to his employment; and (4) that deceased was guilty of contributory negligence. Of these contentions in their order.

1. We think the company was negligent in placing its wires through the branches of trees along Forty-Ninth street so that high potential wires were within 26 inches of low potential wires. The evidence shows without contradiction that proper construction requires such wires to be at least five feet apart, and, even when so placed, should not be permitted to pass through the branches of trees, thereby endangering contact. The negligence of the company was clearly established by undisputed evidence, and the court should have instructed the jury to that effect. Hence, assigned errors in submitting the question to the jury will not be considered.

2. It cannot be said as a matter of law that plaintiff's intestate was working outside of his employment at the time of the fatal shock. Grimm, under the directions of Keebler, his line foreman, performed what is called "outside work," while the "inside work" was in charge of another foreman and different employees. Selby notified the company that the trees in his yard were smoking, and that his son had received a shock. The jury were justified in finding that the company knew that there was "inside" as well as "outside" trouble. Grimm was told by his foreman that the information had been received from 4808 Davenport street—Selby's residence. Grimm was sent

alone to remedy the defects. If the company's division of labor was such that there were men for "outside work" and men for "inside work," then certainly an "inside man" should have been sent with Grimm. But such was not the case; Grimm was sent alone. He was justified in proceeding to the Selby residence and removing the trouble reported from that point, no matter what it was. The company had entrusted him with the job. He was at the Selby residence for that purpose, and, when Mrs. Selby invited him into the house to ascertain whether normal conditions had returned, all that he was doing was on behalf of the company and for its benefit. He was not doing this work out of "idle curiosity," as contended by counsel, but was doing it because it was the duty of the company to attend to such things, and he had been sent alone for that purpose. "The question whether the injured person was acting in the course of his employment is for the jury, * * * where a difference of opinion may reasonably be entertained with regard to the proper inference to be drawn from the testimony." 2 Labatt, Master and Servant, p. 1867; Wood, Law of Master and Servant, sec. 388.

3. Defendant's third contention is that the accident resulting in Grimm's death was one of the ordinary risks incident to his employment. A servant by his contract of employment assumes the ordinary risks and dangers incident thereto. *Missouri P. R. Co. v. Baxter,* 42 Neb. 793; *Dehning v. Detroit Bridge & Iron Works,* 46 Neb. 556. He assumes risks arising from defective appliances used, when such risks are known to him or are apparent and obvious to persons of his experience and understanding. *Union Stock Yards Co. v. Goodwin,* 57 Neb. 138. A servant, however, does not assume the risk arising from his master's negligence. *Chicago, R. I. & P. R. Co. v. McCarty,* 49 Neb. 475.

Did the fatal accident fall within the ordinary and usual hazards of the business in which Grimm was engaged? Whether it did, we think, is a question for the

jury. Whatever may be the rule in other jurisdictions, we think the decision of this court in *New Omaha T.-H. E. L. Co. v. Dent,* 68 Neb. 674, required the submission of the question of assumed risk to the jury. In that case it was held: "An employee assumes only the risks arising from the appliances and materials to be used by him or from the manner in which the business in which he is to take part is conducted, when such risks are known to him or are apparent and obvious to persons of his experience and understanding." HOLCOMB, C. J., said in the opinion: "Taking the knowledge and experience of the deceased, as disclosed by the evidence, can it be said that the dangers from the defective or decayed insulation were so apparent that the deceased was negligent in respect of the manner in which he handled the wires he was working with, or assumed these extraordinary risks incident thereto." In that case an experienced lineman was injured because of defective insulation, while working among wires highly charged with electricity. The defective insulation could have been observed more readily than the dangerous character of the electric light in the case at bar. An employee and the public have the right to assume that the company will not charge an incandescent lamp with 2,300 volts of electricity. If it negligently does so, it cannot successfully contend that its employee assumed the danger arising from its gross negligence. The authorities are that an employee does not assume the risk due to his master's negligence. We think the learned trial court properly left the question of assumed risk to the determination of the jury. The burden of proof was on defendant to establish this defense. *Nadau v. White River Lumber Co.,* 76 Wis. 120. Defendant did not prove that Grimm failed to look for the cross between the wires along Forty-Ninth street, or that he could have ascertained the fact that the wires were in contact from a prudent examination of the wires among the branches of the trees. See *Bernier v. St. Paul Gaslight Co.,* 92 Minn.

214; *Blom v. Yellowstone Park Ass'n,* 86 Minn. 237; *New Omaha T.-H. E. L. Co. v. Rombold,* 68 Neb. 54.

4. It cannot be said that plaintiff's intestate was guilty of contributory negligence as a matter of law. It is true, he took hold of the light without insulating himself, and with knowledge that young Selby had sustained a shock; but he could not presume that the company had negligently charged the fixture with 2,300 volts of electricity. The city electrician testified that one would conclude that young Selby would have been instantly killed had the' fixture been charged with the dangerous current. This, together with the fact, as shown by the record, that it is not unusual for boys and women with soft hands to receive severe shocks from the ordinary current in incandescent lamps, might have led Grimm, or any other prudent man, for that matter, to presume that no serious harm would result from contact with a fixture which is ordinarily free from dangerous currents.

Where a young man 21 years of age, and an electrician, had seen the proprietor of a cafe attempt to turn out the electric lights on a chandelier, and, after seeing him draw back on account of a shock received, attempted to turn out the lights, and received a shock from which he died, it was held, in *Predmore v. Consumers L. & P. Co.,* 99 App. Div. (N. Y.) 551, that the question of his contributory negligence was for the jury. The court said that it was true he had seen the proprietor draw back on account of the shock received, but that, on the other hand, it was to be observed that he must have noticed that this shock had not produced any serious effects, and it could not be held, as a matter of law, that he was at fault for supposing that he could turn out the light himself without risk of fatal injury.

In an action for death caused by an electric current from wires used in lighting a house, where the usual voltage was less than enough to be dangerous to life, whether the deceased was guilty of contributory negligence in handling the wire was a question for the jury.

*Witmer v. Buffalo & N. F. E. L. & P. Co.*, 112 App. Div. (N. Y.) 698. In the *Dent* case it was held that the deceased's contributory negligence was not so conclusively proved that there was no reasonable chance of different minds reaching different conclusions, and to have been properly submitted to the jury.

Under the rule announced in the foregoing authorities, we think the question of contributory negligence of the deceased was for the jury. It is argued, however, by counsel for the power company that deceased was instructed by his foreman that the dangerous condition in Selby's residence was probably due to contact of primary and secondary wires in the trees on Forty-Ninth street, and hence he was guilty of negligence in taking hold of the light with knowledge of this fact. The conversation with deceased before he started for Dundee, as testified to by the foreman of the company, was admitted over plaintiff's objection. The competency of this testimony is challenged. However, if properly admitted, the record is still silent on one point. It does not disclose what examination Grimm made of the wires along Forty-Ninth street to discover a cross before proceeding to the residence of W. L. Selby. The city electrician, a man of considerable experience, testified that the trees were so thick along Forty-Ninth street that he could barely see the crossed wires. For all that this record discloses Grimm had made a careful examination along Forty-Ninth street, and failed to discover the wires which could barely be seen among the branches of the trees. The burden was on the company to prove that he did not make such examination before appearing at the Selby residence. This it failed to do, and the jury were justified in finding that Grimm had no knowledge of the deadly current in the residence.

We do not think the learned trial court was in error in submitting this case to the jury, and therefore recommend an affirmance of the judgment.

DUFFIE and GOOD, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

The following opinion on rehearing was filed January 23, 1908. *Former judgment of affirmance adhered to:*

1. Master and Servant: INJURY: PRESUMPTIONS. The instinct of self-preservation and the disposition of men to avoid personal harm may, in the absence of evidence, raise the presumption that a person killed or injured was in the exercise of ordinary care.

2. ——: ASSUMPTION OF RISK: BURDEN OF PROOF. In an action against a master for negligence, the burden of establishing an assumption of risk is on the master.

3. ——: NEGLIGENCE: QUESTIONS FOR JURY. In an action for the death of an employee, *held* that whether he was guilty of contributory negligence in taking hold of an incandescent lamp charged with a deadly current of electricity, or assumed the risk of injury, was for the jury.

EPPERSON, C.

A rehearing has been granted, and the case reargued, and again submitted. The first and second divisions of our former opinion, *ante,* p. 387, are not assailed. We have considered further the questions of assumed risk and contributory negligence in the light of additional adjudications called to our attention by appellant's able counsel. Did the fatal accident fall within the usual hazards of the business in which Grimm was engaged? We confess that the case is not free from difficulty, and that the question involved is a close one. On first impression, one is inclined to think that deceased assumed the risk and that his administratrix cannot recover; but, upon mature reflection, the view taken by the learned trial court seems more just and reasonable, and leads one to conclude, whatever may be his views if acting as a trier of fact, that there is a reasonable probability of different minds reaching different conclusions on the question of assumed risk, and hence its determination should be left, where the district court placed it, with the jury. At any

rate, we must presume that the lower court's ruling was correct, until the contrary is established.

There is another presumption which must be given weight. The record is silent as to the conduct of the deceased from the time he left the defendant's place of business until he arrived at Selby's residence, where the accident occurred. "The instinct of self-preservation and the disposition of men to avoid personal harm reinforce an inference that a person killed or injured was in the exercise of ordinary care." 16 Cyc. 1057, note 49; *Baltimore & P. R. Co. v. Landrigan*, 191 U. S. 461; *Kansas City-Leavenworth R. Co. v. Gallagher*, 68 Kan. 424, 64 L. R. A. 344; *Hendrickson v. Great Northern R. Co.*, 49 Minn. 245; *Northern P. R. Co. v. Spike*, 121 Fed. 44. In the case last cited, Caldwell, Circuit Judge, said: "The presumption arising from this natural instinct of self-preservation stands in the place of positive evidence, and is sufficient to warrant a recovery, in the absence of countervailing testimony. * * * Nor is this presumption applied only when no one witnesses the accident. It has its application in all cases, and may be strong enough to overcome the testimony of an eye-witness. * * * This principle has been repeatedly affirmed and applied by the supreme court of the United States."

Another inquiry is: Upon whom is the burden of proving that Grimm assumed the risk of the accident which resulted in his death? We think the weight of authority is that the burden of sustaining this defense is upon the defendant. *Dowd v. New York, O. & W. R. Co.*, 170 N. Y. 459; *Galloway v. Agar Packing Co.*, 129 Ia. 1; *Arenschield v. Chicago, R. I. & P. R. Co.*, 128 Ia. 677; *Mace v. Boedker & Co.*, 127 Ia. 721; *Nadau v. White River Lumber Co.*, 76 Wis. 120; *Norfolk & W. R. Co. v. Ward*, 90 Va. 687, 19 S. E. 849; *Missouri, K. & T. R. Co. v. Jones*, 35 Tex. Civ. App. 584, 80 S. W. 852; *McDonald v. Champion Iron & Steel Co.*, 140 Mich. 401; *Judd v. Chesapeake & O. R. Co.*, 18 Ky. Law Rep. 747, 37 S. W. 842; *Jackson Lumber Co. v. Cunningham*, 141 Ala. 206, 37 So. 445.

In view of the rules above stated and the general principles announced in the former opinion, can it be said that deceased must be held as a matter of law to have assumed the risk of the injury which caused his death? Grimm was "a first-class lineman," who had been in defendant's employ for a year and a half. Defendant, however, contends that he was "a trouble finder," that his employment required the performance of dangerous duties, and that the risks which he assumed were commensurate with his extra-hazardous employment. In defendant's brief it is said: "James C. Grimm, a lineman and troubleman of large experience, familiar with the work and the dangers of his employment, was selected for this particular service of inspecting and repairing the defective and dangerous conditions referred to." The only evidence in support of this contention is the testimony of defendant's foreman, who said that Grimm was a lineman receiving $2.85 a day; that $2.85 was the standard wage (for lineman, we suppose); that he usually earned a little more salary than others working in the same capacity, because he worked a great deal over time. "He was a man whom I would take for over-time work, taking care of trouble or anything that might come up after the ordinary hours, and in that way used. We usually have trouble after a storm. * * * Q. What sort of trouble? A. From various causes. The wires become deranged after a wind, and, so, many things have a great deal to do with causing trouble. Wires come in contact with poles and wood, and so on, that might cause any burning of high potential wires. Q. State whether you have cases where wires of different potentiality come in contact? A. That occurs at times; yes, sir. Q. So all of these conditions occur from time to time? A. They do. Q. In the life of an electric light man, you say? A. Yes, sir. Q. State what the fitness or competency of Mr. Grimm was with respect to that class of work. A. I considered him a first-class man." If the above evidence is sufficient to establish, to such a degree of certainty that all reasonable minds are con-

vinced, that Grimm was employed for the purpose of finding and repairing dangerous defects of an extra-hazardous nature, and that his experience or knowledge was such that he knew or should have known the probable results of his conduct at the time of his death, then the defendant was justified in sending him out upon this hazardous service, and Grimm assumed the risk incident thereto. Defects, such as caused Grimm's death, it appears from the evidence quoted, occur from time to time during the life of an electric light man. From this it would seem improbable that the deceased, a man 23 years of age, had by experience acquired a great deal of knowledge regarding defects of the kind testified to. It does not appear that he received extra wages for extra-hazardous service, nor does it appear that he had been engaged in extra-hazardous work. At most, he was used for over-time work taking care of trouble. The nature of the trouble referred to by the witness is not known, but a reasonable inference, in the absence of an explanation, and in view of the fact that Grimm was receiving a lineman's wages, is that it referred to common-place troubles, and not such as are extra-hazardous and dangerous to human life. The administratrix testified that her husband (Grimm) was "a lineman." The jury, under all the circumstances of the case, were not compelled to find that deceased was an inspector or trouble finder.

However, if plaintiff's decedent knew that the wires on Forty-Ninth street were in contact, and with this knowledge attempted to turn on the light in Selby's residence, we can see how it could be held that he assumed the risk. The question of the assumption of risk generally turns upon the actual or constructive knowledge of the deceased of the dangers at the time of the injury. "The doctrine of the assumption of risk is wholly dependent upon the servant's knowledge, actual or constructive, of the dangers incident to his employment. Where he knows, or in the exercise of reasonable and ordinary care should, know, the risks to which he is exposed, he will, as a rule, be held to

have assumed them; but where he either does not know, or, knowing, does not appreciate, such risks, and his ignorance or nonappreciation is not due to negligence or want of due care on his part, there is no assumption of risk on the part of the servant preventing a recovery for injuries." 26 Cyc. 1196-1199, and many cases there cited.

Now, the burden of proving that Grimm had knowledge, or should have known, of the risks to which he was exposed, rested upon the defendant company. There is no proof, and the record is silent, as to the conduct of the deceased immediately prior to his appearance at the Selby residence on the morning in question. If we take as true the foreman's version of the conversation that he informed deceased that the disturbance was due to crossed wires on Forty-Ninth street, still the record does not disclose what examination Grimm made of the wires along Forty-Ninth street to discover a cross before proceeding to Selby's residence. The city electrician, a man of considerable experience, made an examination of the wires along Forty-Ninth street after Grimm was killed, and testified that he could barely see the crossed wires among the branches of the trees. For all that the evidence discloses, Grimm may have made an examination of the wires on Forty-Ninth street, and failed, in the exercise of due care, to discover the crossed wires, which could barely be seen among the branches of the trees. If Grimm had been informed of the contact of the wires, he certainly had the highest motives for making such an examination, for his life depended upon such caution being taken. The company did not prove that he failed to make such an examination, or was aware of the crossed wires, or did not use ordinary care to discover them. In view of the natural instinct of self-preservation and the disposition of men to avoid personal harm, the jury were justified in presuming that plaintiff's intestate was in the exercise of ordinary care, and had made a prudent examination of the wires on Forty-Ninth street, and failed to discover the wires in contact among the branches of the trees. If this

is true, then deceased did not know that Selby's incandescent lamp was charged with the deadly current of 2,300 volts of electricity. "In the absence of evidence conclusively establishing assumption by a servant of the risk of his employment, the fact that the servant did not establish affirmatively that he had no knowledge of the risk, and therefore did not waive it, will not prevent a finding that he was not chargeable with knowledge." *Dowd v. New York, O. & W. R. Co.*, 63 N. E. 541 (170 N. Y. 459).

Another view of the evidence, one very unfavorable to defendant, may be reasonably taken. Defendant's foreman testified, as stated in our former opinion, that he told Grimm "that in all probability there was a cross between the primary and secondary wires on Forty-Ninth street, that he should look carefully along Forty-Ninth street as the trees were pretty thick there, and that the trouble in all probability would be found at that point." No living person can either corroborate or refute the foreman's testimony as to this conversation. If, as this witness testified, he knew that the high and low potential wires were in contact, ordinary prudence would dictate that he should have informed not only Grimm, but, further, that he should have warned the Selby family, or immediately cut off the death dealing current, not necessarily for the protection of Grimm, but for the protection of the company's patrons and the public generally. It would not be an unreasonable inference for the jury to draw from the evidence that defendant's foreman never instructed Grimm as he said he did, but sent him forth on his fatal mission without warning, and to deal with dangers he never assumed. Morrison, an electrician with greater experience than Grimm, was fully conversant with all the facts communicated to defendant by the Selbys, and not until Grimm's death did he think that the disturbance was caused by contact of the high and low potential wires. We also have the testimony of Mr. Michaelson, a fair witness, and an experienced electrician, to the effect that knowledge of the shock to the Selby boy would not indi-

cate to an electrician that the lamp where the shock was received was extra dangerous, but quite the contrary, as the boy survived.  How the facts known and communicated by Mr. Selby would indicate to the defendant's foreman that there was contact of high and low potential wires, and thereby give him occasion to communicate such facts to Grimm, was undoubtedly not explained to the satisfaction of the jury, and has not been explained to our satisfaction.  In our former opinion, we erred in reciting this conversation as an established fact in the case, but this was not prejudicial to the defendant.

Our attention is called to cases which, it is claimed, are in conflict with the conclusion we have reached.  The principal authority cited is *Bell Telephone Co. v. Detharding,* 148 Fed. 371, wherein it was held: "Plaintiff's intestate was employed by defendant telephone company as a 'trouble finder,' and was sent by his superior, in the line of his duty, to ascertain the cause of the failure of a telephone to work properly, which was unknown.  In climbing a cable pole his hand came in contact with a guy wire, from which he received an electric shock, which caused him to fall, and he was killed.  From the effects of a storm on the previous night, or from some other cause not shown, the telephone wires leading from the pole had sagged across electric light wires, and had become heavily charged with electricity, and also charged the guy wire. *Held,* That the risk from such danger was one known to and assumed by plaintiff's intestate as one necessarily incidental to his employment, and that there could be no recovery from the defendant for his death."  This case, at first thought, would seem decisive of the one in hand; but, when we bear in mind that in the case cited there was, as expressly stated by the court, no "lack of diligence on the part of the defendant below shown," and apply the rule established in this state that "a servant generally does not assume the risk of dangers due to his master's negligence" (*Chicago, R. I. & P. R. Co. v. McCarty,* 49 Neb.

29

475), we are constrained to hold that plaintiff's intestate did not, as a matter of law, assume the risk due to defendant's negligent construction of its electric wires. See *Belvidere G. & E. Co. v. Boyer*, 122 Ill. App. 116; *Chicago, S. W. & L. Co. v. Hyslop*, 227 Ill. 308.

We now come to the other question presented for further discussion. It is unnecessary here to repeat what was said in the fourth division of our former opinion. Additional authorities have been cited, and examined, and are found not to require the overruling of our former pronouncement on the question of contributory negligence. This case is clearly distinguishable from cases like *Citizens Telephone Co. v. Westcott*, 99 S. W. (Ky.) 1153, and *Johnston v. New Omaha T.-H. E. L. Co.*, 78 Neb. 27, and must be classed with those like *Predmore v. Consumers L. & P. Co.*, 99 App. Div. (N. Y.), 551, and *Belvidere G. & E. Co. v. Boyer, supra*. In the first class the courts held, for obvious reasons, that the injured party knew of, and deliberately placed himself in, a position to receive an electric shock, and hence could not recover. In the latter class experienced electricians knew that others had received shocks from electric fixtures not resulting fatally, and after knowing the effect of contact therewith attempted to adjust the difficulty, and were killed. ⁻Such circumstances do not so clearly establish contributory negligence as to remove the question into the realm of undebatable fact and require a peremptory instruction to the jury. See authorities cited in former opinion.

In *Belvidere G. & E. Co. v. Boyer, supra*, the company was engaged in running an electric plant in the city of Belvidere. Deceased, a man of considerable experience with electric machinery, was its engineer and had charge of the building and the machinery and the men employed therein, and, when repairs were to be made in the room, he made them or saw that they were made. Another employee, one Tynan, received a shock from a wire on which a light was suspended. The shock rendered him unconscious for a time. Deceased said he would take the wire

down so no one else would get hurt. He was warned by the employee who had received the shock, but went into the room where the light was, and the only eye-witness to the accident says he saw him attempt to take down the extension, and it seemed to draw him right up. He was reaching for the plug—he knew enough not to take hold of the wire—but he was killed. The wire was intended for and usually carried but 110 volts. Unknown to deceased the wire had come in contact outside of the building with another wire carrying 1,100 volts. In the opinion the court said: "While the proof shows men had received shocks from the wire that caused Boyer's death two or three days before his death occurred, and that Boyer knew of this, it further shows the shocks were not of a serious nature before the one received by Tynan, and, further, that the conditions which caused these shocks to the men were not known to any one whose employment was inside the building until after Boyer's death. The fact that persons handling the wire received slight shocks might indicate that the insulation on the wires was worn and defective without apprising one of the fact that they had come in contact with a wire outside, which was carrying a powerful current." The court left the determination of the question of contributory negligence to the jury, and said in the syllabus: "In determining whether one who has lost his life by an accident has been guilty of contributory negligence, it is only proper to consider his acts in connection with conditions as they appeared and were known at the time of the accident, and conditions not known to exist until after his death should be rejected." See, also, *Chicago, S. W. & L. Co. v. Hyslop, supra.*

While the questions presented by the record before us are not free from difficulty, we think the facts are such that reasonable men would differ as to the proper inference to be drawn. This being true, the district court was not in error in submitting the case to the jury.

We therefore recommend that our former judgment of affirmance be adhered to.

DUFFIE and GOOD, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of affirmance heretofore entered is adhered to.

AFFIRMED.