[Civ. No. 1573.    Third Appellate District.—September 4, 1916.]

## WILLIAM EARL, Respondent, v. SAN FRANCISCO BRIDGE COMPANY (a Corporation), Appellant.

NEGLIGENCE — EMPLOYER AND EMPLOYEE — PERSONAL INJURIES FROM ELECTRIC CURRENT—CHANGING SWITCH WITHOUT NOTICE.—An employee of a corporation who receives personal injuries from a powerful electric current while engaged in replacing a fuse in the electrical apparatus of the company, under the orders of its chief engineer, whose duty it was to make the repair, the accident resulting from the failure of a switch, used to protect the employees while

putting in fuses, to perform its functions, the employee having no knowledge or notice of this change of condition in the switch, and having every reason to believe that by manipulating the switch the current would be completely cut off so that the fuse could be inserted without danger, is entitled to recover from his employer damages for the injury sustained.

ID. — CONTRIBUTORY NEGLIGENCE — FAILURE TO EXAMINE APPARATUS — WHEN EXCUSED.—Where the proximate cause of the injury was the failure of the switch to disconnect the current, and this resulted from a change made by the company unknown to the employee, it was not negligence for the latter to assume that conditions were as before, and that the switch would disconnect the current; and he was therefore not chargeable with contributory negligence in not examining the apparatus.

ID.—KNOWLEDGE OF DANGER—EMPLOYEE ACTING UNDER ORDERS.—If the employee had full knowledge of the change in such a case he would not be chargeable with contributory negligence in obeying orders of the chief engineer under whose direct supervision he was acting, unless performance thereof was inevitably or imminently dangerous.

ID. — EMPLOYERS' LIABILITY ACT — ASSUMPTION OF RISK. — Under the Employers' Liability Act in force at the time of the accident in question a defense that the employee assumed the risk of the employment was not open to the defendant.

ID.—MEASURE OF DAMAGES—DISCRETION OF JURY.—In actions for damages for personal injuries it must be largely left to the discretion and sense of justice of the jury, subject to the supervision and correction of the trial court, to determine the amount that will be a fair compensation for the suffering and misery and financial loss endured by the injured party.

ID.—INSTRUCTIONS—MEASURE OF DAMAGES.—In an action for damages for personal injuries, an instruction to the jury that they should assess the damages, if any, in such sum as they believe under all the circumstances and evidence plaintiff ought to recover, if standing alone might be misleading, but where it is supplemented by specific directions as to all the elements of damage that the plaintiff can recover, it cannot be misunderstood.

ID.—STATEMENT OF CLAIM—USING LANGUAGE OF COMPLAINT.—There is no error in the court stating the claim of plaintiff in the language of the complaint.

ID.— AFFIRMATION OF THE ISSUE — PREPONDERANCE OF EVIDENCE — DEFINITIONS OF.—Where the court in the instructions given on behalf of the defendant sufficiently defined the terms "affirmation of the issue," and "preponderance of the evidence," if any further elucidation was desired, it should have been requested.

ID.—EVIDENCE—HOSPITAL CHARGES.—A motion to strike out the testimony on cross-examination of a doctor as to the value of the hospital services incurred by the plaintiff in an action for damages for personal injuries, the motion being made upon the ground that he was testifying as to what the usual charges were, and not the actual charges in the case, is made too late, where he had so testified on direct examination without objection.

ID.—EVIDENCE—INADMISSIBILITY OF WRITTEN REPORT.—Where a witness testified from memory with his written report before him that he was at a certain place at a certain time, the report itself was not admissible as corroboration of this testimony.

APPEAL from a judgment of the Superior Court of Solano County, and from an order denying a new trial. A. J. Buckles, Judge.

The facts are stated in the opinion of the court.

H. B. M. Miller, for Appellant.

Walter Shelton, Campbell, Weaver, Shelton & Levy, and Frank R. Devlin, for Respondent.

BURNETT, J.—The interesting argument of appellant is based largely upon the theory that we must discredit and reject the testimony in favor of respondent's contention. It should hardly be necessary to add that we are not permitted to do so, since the statements therein contained are not improbable. Indeed, after a careful reading of the entire record, we can only say that at most a substantial conflict is presented as to the material elements of the alleged cause of action.

The facts, as substantially stated and shown by respondent, are as follows: Appellant at the time of the accident was engaged in dredging a channel near Pinole Flats at Mare Island in Solano County, and for said purpose was using dredgers, pumps, and other machinery and equipment operated by electricity. On the 7th of November, 1913, plaintiff was in the employment of the defendant as an operator in and about one of its pumping stations or substations, and it was his duty, under said employment, "to work with, use, handle and repair the machinery, apparatus and equipment in and about said pumping plant or station." While he was so engaged "he was required by defendant to replace a fuse or

connection in the aforesaid apparatus and equipment, and plaintiff, before proceeding to do so, turned or threw the switch provided by defendant to disconnect the electrical current from that portion of said electrical apparatus or equipment where plaintiff was about to insert the aforesaid fuse or connection, but owing to the unsafeness, unsuitableness, unfitness, defectiveness and dangerous and unrepaired condition of said wires, . . . devices and electrical equipment, a powerful and dangerous electrical current of high potential used by defendant on said electrical apparatus and equipment for the purpose of supplying power to be used as aforesaid, was not disconnected from the aforesaid electrical apparatus and equipment, but said electrical apparatus and equipment remained surcharged therewith and defendant carelessly and negligently and knowingly, but without the knowledge of plaintiff, failed to disconnect or cause to be disconnected the aforesaid electrical apparatus and equipment from the aforesaid current, so that when plaintiff undertook to replace the aforesaid fuse or connection as required by defendant, he came in contact with the aforesaid powerful and dangerous current and received the same into and through his body, and suffered great shock and injury.'' Defendant's machinery and apparatus where plaintiff was employed was protected from unusual electric currents by means of fuses which melted or ''blew out'' and thus automatically disconnected the current when it became too strong. Whenever a fuse blew out, it was the duty of plaintiff to insert another.

Until just prior to the accident, defendant had furnished a switch or cut-off which could be used to disconnect the current, and a fuse could then be put in without any danger; and while this condition prevailed plaintiff had restored many of these fuses.

A few days before the accident, that part of the switch disconnecting the middle phase of the three incoming high-tension wires, burned out, so that it had to be repaired in order to re-establish the connection on the middle wire. The duty to make this repair devolved upon defendant's chief engineer and not upon plaintiff. Instead of restoring the switch to its original condition, the chief engineer connected the middle high-tension wire directly to the middle transformer wire by means of an ordinary wire called a ''solid'' or ''jumper'' so that the middle phase could not thereafter be disconnected.

As a consequence, the middle wire was always alive, so that when the two outside high-tension wires were disconnected by throwing the switch, the corresponding wires below the switch, where the fuses had to be inserted, were always charged by a return current from the transformer. Although the fuses in the two outside wires were still kept in use to protect the machinery and had to be replaced when they blew out, the switch to protect the employees while putting in fuses no longer performed its function. While the switch appeared to accomplish its purpose on the wires where the fuses had to be inserted, and apparently disconnected the current in those wires as it had always done, there was a way left open for the current to become a hidden and disguised peril. We must conclude from the record that plaintiff had no knowledge nor notice of this change in the condition of the switch, but, to the contrary, had every reason to believe that by manipulating the switch, the current would be turned off completely so that the fuse could be inserted without danger. Herein lies the negligence of defendant. It consisted manifestly in making such change in the electrical appliances without notifying plaintiff. Of course, if it had not been the duty of respondent to restore the fuses, a different question would be presented. But from the showing made, we must accept it as true that such was the duty of respondent, and, moreover, that the chief engineer specifically ordered him to put in the fuse and in effect assured him that he was not incurring any danger.

Reduced to its simplest form, the case seems clearly to be that a safe place was furnished to plaintiff for his work with certain appliances that he could and did use in a certain manner without danger; that said appliances were changed in a material way without his knowledge; that thereby they could not be safely operated as before; and that, while performing his duty, he was greatly injured in consequence of said change having been made.

The essential features of the situation are covered in the following narrative of plaintiff: "I am thirty-three years old. My occupation has been that of rigger, and for that work I have received from $90 to $125 per month. . . . I was operator on the relay station; my duties were to see that the pump was oiled, well greased and oiled and running; . . . if anything happened, a fuse blown out, we were supposed to put it

back in place, supposed to keep the thing running. I had been employed there about a month; I had been in the employ of the San Francisco Bridge Company about two and a half months; during that time I had worked there on the machine, on the dredger as a handy man. I was off about four days before the morning on which I was hurt; I reported for duty on the dredger, on board the launch, at 7 o'clock, and I was told to go over aboard the Booster and pack the pump and get ready to start up, and I did so; two hours later Mr. Purcell, the chief engineer, came by in the launch and said he was going to cut in the power from Vallejo and when he did to start the pump; I started the pump immediately as soon as the power came into the building. We ran for about ten minutes when the motor burned out; I shut off the power and stopped the motor and hoisted up the flag to call the launch up, and they came back, that is, Mr. Purcell and Mr. Squires. I called them back; it was my duty to accept instructions in regard to my work from these two men I called back. After I had thrown the controller so that the power went on and the motor did not run, Mr. Purcell went out in the back of the Booster where the transformers are, and he came in directly afterwards and said, 'Earl, there is a fuse blown; go put one in.' I took the key to the cut-out and went outside and unlocked the cut-out or switch, that is, the disconnecting switch, and pulled it out and disconnected the power from the fuse platform and locked it out. When I pulled the arm of the connecting switch down and locked it, Mr. Purcell was there; I asked him if all was ready and he said yes. Then I went up and caught hold of the thumb-screw and was caught. The thumb-screw was on the inside wire, that is, the one nearest the building. I just stayed there burning. I first felt a sensation in the throat here, then the burns down here [indicating], then I felt the legs burning, both of my legs from here down here. The key that I had I put in my mouth and had it there when I was on the wire; I tried to spit it out but could not; I was tense on the wire and could not do anything except to hang there. I was in the hospital about five months; I had to undergo one large operation and three minor ones; I have not been able to work since that time; some nights I sleep pretty good and some nights I don't sleep a single wink; that did not exist before the accident; before my injury I weighed 168 or 170 pounds, and when I got out of

the hospital I weighed 105; now I weigh about 140 pounds. I was not nervous before the accident. My doctor's bills and expenses at the hospital were between thirteen hundred dollars and fourteen hundred dollars. I had put in fuses lots of times before I was hurt. The correct method of putting in one of these fuses was to take the key and go out and unlock the cut-out and pull down the switch; the cut-off switch is a pole running up the height to the three cut-off leaders, it cuts off the power from the coming-in wires to the fuse wire; I had been in the habit of doing that before this time. *When I went up that day to put that fuse in, I had never been told or advised by anyone and did not know that the cut-out or switch that I had undertaken to disconnect had been changed or modified in any way; I did not notice at any time that morning any change or modification in the cut-off or switch; at the time of the accident when I was up there I saw the wire then at that time, running from the high-tension wire that brings the current in.* It ran to the lower fuse bracket and switch, it was connected with the center wire; I saw that wire from above the switch to the lower fuse bracket, it was joined at one end to the main feed wire and then across the cut-off switch, the middle arm, and extended down below the middle fuse and attach to the lower fuse bracket. It was four days before I was hurt that I had seen that cut-off or switch; it was not then in that condition, it was in good condition.''

He further testified that he caught hold of the thumb-screw to put in the fuse when he got to the top of the ladder, and the accident happened immediately, and that he did not know that it was dangerous to come in contact with the wire while "the cut-off was thrown out," nor was he told that "in the condition affairs were in on that platform that the cut-out did not cut the current off.''

Applying to the foregoing testimony the familiar legal principles involved in such cases, we reach the conclusion that appellant was rightfully charged with the burden of responding in damages for the injury suffered by plaintiff. Those principles need not be restated, and it is probably sufficient, without quotation, to refer to *Stephens* v. *Pacific Electric Ry. Co.*, 16 Cal. App. 512, [117 Pac. 559] ; *Giraudi* v. *Electric Improvement Co.*, 107 Cal. 120, [48 Am. St. Rep. 114, 28 L. R. A. 596, 40 Pac. 108] ; *Reeve* v. *Colusa Gas & Electric Company*, 152 Cal. 99, [92 Pac. 89] ; *Dow* v. *Sunset Telephone*

*Co.,* 157 Cal. 182, [106 Pac. 587] ; *Grimm* v. *Omaha Electric Light and Power Co.,* 79 Neb. 387, [112 N. W. 620].

It is, however, insisted that respondent was guilty of such contributory negligence as to prevent recovery. The real basis for the contention is that respondent is chargeable with knowledge of the dangerous character of the element with which he was dealing. That he was not ignorant of the peril involved in coming into contact with a current of such voltage must be conceded, and that he should be required to exercise care in operating the appliances cannot be disputed; but these considerations are only remotely, if at all, connected with the controversy here. The real danger, the proximate cause of the injury was, as we have already seen, the failure of the switch to disconnect the current, and this by reason of a change made by appellant. It was not negligence on the part of respondent to assume that conditions were as before, and that the switch would disconnect the current. Having the right to assume that the appliance was in the same condition, he was excusable for his failure to make an examination or inspection whereby he might have ascertained what had been done; nor was the difference in the appearance of the equipment so palpable and obtrusive as to compel the conclusion that while hastening to perform his duty, if he had exercised ordinary care he would have discovered the change.

Moreover, plaintiff, as testified to by him, was acting under the direct supervision of the chief engineer and was entitled to rely upon his superior knowledge. In *Price* v. *Northern Electric Ry. Co.,* 168 Cal. 173, [142 Pac. 91], it is said: ''He was working under the immediate supervision of a foreman and was not erecting trestle bents or creating them on his own judgment and at his own risk. In the absence of actual knowledge to the contrary, or circumstances under which he would be held to be required to have such knowledge, he had the right to assume, when directed to assist in removing the scaffolding, that the bent had been so braced that it would not fall when the scaffolding was removed. And it cannot be held as matter of law, under the circumstances, that he was guilty of contributory negligence in not observing the absence of bracing, however obvious that fact might have been if he had made an examination to see what the actual condition was.'' (See, also, *Cumberland Tel. & Tel. Co.* v. *Graves' Admx.* (Ky.), 104 S. W. 356; *Chicago Suburban W. & L. Co.*

v. *Hyslop,* 227 Ill. 308, [81 N. E. 381] ; *Green* v. *Varney,* 165 Cal. 347, [132 Pac. 436] ; *Lee* v. *Woolsey,* 109 Pa. St. 124.)

Moreover, if plaintiff had full knowledge of the change he would not be chargeable with contributory negligence in obeying orders unless performance thereof was inevitably or imminently dangerous.    (*Martin* v. *California Central Ry. Co.,* 94 Cal. 326, [29 Pac. 645] ; *Anderson* v. *Seropian,* 147 Cal. 201, [81 Pac. 521] ; *Patterson* v. *Pittsburg and C. R. Co.,* 76 Pa. St. 389, [18 Am. Rep. 412] ; *Van Duzen Gas etc. Co.* v. *Schelies,* 61 Ohio St. 298, [55 N. E. 998].)

There is room for the application of this principle since there was testimony on the part of appellant that the work done by respondent was not imminently and necessarily dangerous.    The chief engineer testified that after the repairs he put in a fuse on the outside wire without injury and that he, an electrical and steam engineer of twenty years' experience, "did not consider it taking a chance" to put in a fuse. Defendant's superintendent, a civil engineer, who was present at the time of the accident, testified that he knew the middle wire was through solid and that he did not warn plaintiff, but that he "did consider that a man had to exercise more care up there after the middle wire was through solid." From this statement it is quite clear that he did not consider putting in the fuse as particularly and obviously dangerous, or else he would have cautioned plaintiff.    Upon this theory it is a reasonable conclusion that plaintiff was justified in believing that he could perform the duty intrusted to him without danger if he exercised the care necessarily required in directing and controlling an electric current of such voltage.

In this connection it might be well to state the suggestions of respondent that since plaintiff proceeded carefully and skillfully, there was no more than an assumption of risk if he realized the danger, and that this defense was not open to defendant, the Employers' Liability Act having been in force at the time of the accident.    (*Crabbe* v. *Mammoth Channel G. Mining Co.,* 168 Cal. 500, [143 Pac. 714].)

Another point urged upon our attention is that the verdict is excessive and therefore should be set aside.    The amount awarded is quite large, but respondent was grievously injured, and we cannot say that it is so disproportionate to the damage done as to compel the conclusion that the jury were

controlled by passion or prejudice.    We may supplement the testimony of plaintiff on the subject already quoted, by the following statement of Dr. E. A..Peterson, one of the attending physicians: "It was January 15th when I first saw the plaintiff; Dr. Klotz asked me to come over there and help him operate on a man he was going to leave in my charge, as he was going away. I assisted him in the operation, removing the internal condyle of the tibia; he was in my charge from then on;. he was in a very critical condition from the inflammation which he had in the bone, which caused a good deal of pain, and we had to remove it, and other bone became infected, and it was necessary to operate on him three times about, to remove pus from under the periosteum, the covering of the bone, and there is nothing more painful, so excruciatingly painful. He was suffering a general condition, as I understand it, he was very much run down, and he had to be put under an anaesthetic three times more. The cause of his condition was the generally weakened vitality, especially as the bone had been burned and rendered very inactive and unhealthy from being burned; this is what we call a complication after a burn. The complications which occurred in this case were unavoidable, and the condition I have described was not due to any neglect that the plaintiff may have received. His pain was so great that opiates would not relieve it. This condition continued from about January 17th to—well, it was a month, anyway, that he was in awful agony. . . . The plaintiff, in my opinion, will never be able to perform labor such as a rigger, or any structural work owing to his present condition."

Dr. Klotz described minutely the patient's condition, and, among other things, said: "The bone was diseased from the electric shock, that is the necrosis, the live bone was destroyed. . . . The nervous condition was due, of course, to the shock and electrical burns that he had. If a person were to receive enough electricity to throw them down and to require artificial respiration and of course burns like the patient had, it would leave him in an awful state afterward. . . . He never will be able to perform such services as a rigger, a person who has formerly worked with his feet, arms and hands."

Of course, in cases like this, there is no certain and absolute measure of damages. It must be largely left to the dis-

cretion and sense of justice of the jury, "subject to the supervision and correction of the trial court," to determine the amount that will be a fair compensation for the suffering and misery and financial loss endured by the injured party. The severity of the injury caused by electricity is a matter of general observation, and the courts have been quite liberal in upholding verdicts for large amounts in such cases. As illustrating this tendency of the courts, we may refer to the following cases cited by respondent: *Tedford* v. *Los Angeles Electric Co.*, 134 Cal. 76, [54 L. R. A. 85, 66 Pac. 76]; *Reeve* v. *Colusa Gas and Electric Co.*, 152 Cal. 99, [92 Pac. 89]; *Southwestern Tel. & Tel. Co.* v. *Shirley* (Tex.), 155 S. W. 663; *Hill* v. *Union Light and Power Co.*, 260 Mo. 43, [169 S. W. 345]; *New Omaha Thompson-Houston Electric Light Co.* v. *Rombold*, 68 Neb. 54, [93 N. W. 966, 97 N. W. 1030]; *Goetzke* v. *City of Chicago*, 174 Ill. App. 446.

Some errors in the matter of instructions and rulings of the trial judge are claimed, but they seem to be without substantial merit.

The instruction to the jury that they should assess the damages, if any, in such sum as they believed under all the circumstances in evidence, the plaintiff ought to recover, if standing alone might have been misleading, but it was supplemented by specific directions as to all the elements of damage that the plaintiff could recover and, therefore, could not have been misunderstood as claimed by appellant. (*Zibbell* v. *Southern Pacific Co.*, 160 Cal. 237, [116 Pac. 513]; *Harmon* v. *Donohoe,* 153 Mo. 263, [54 S. W. 453]; *Lamb* v. *City of Cedar Rapids,* 108 Iowa, 629, [79 N. W. 366]; *Denver City Tramway Co.* v. *Martin,* 44 Colo. 324, [98 Pac. 836].)

There was no error in stating the claim of the plaintiff in the language of the complaint. It was certainly proper to inform the jury as to the issues, and it is a mere question of rhetoric whether for this purpose the language of the pleadings or equivalent phraseology should be used.

There is no merit in the contention by appellant of the alleged failure of the court to define "affirmation of the issue" and "preponderance of evidence." As a matter of fact, they were sufficiently defined in the instructions given on behalf of defendant, and if any further elucidation was

desired it should have been requested.   (*O'Connor* v. *United Railroads*, 168 Cal. 43, [141 Pac. 809].)

The instructions as a whole were very fair and presented every legal phase of the case that was needed for the enlightenment of the jury.   Every instruction requested by defendant was given, and in those given on behalf of plaintiff, we find no prejudicial error.

The court properly refused to strike out the testimony on cross-examination of Dr. Klotz as to the value of the hospital services incurred by plaintiff.   The motion was upon the ground that he was testifying as to what the usual charges were and not the actual charge in this case, but he had so testified on direct examination without objection, and the motion came too late.   Moreover, the testimony of plaintiff as to that point was uncontradicted, and hence the doctor's testimony could not have prejudiced defendant.

Objection is made to the ruling of the court excluding a written report to the company made by William J. Knoll, a witness for defendant.   The only purpose of the evidence was to show that the witness was at the station in number 5. The witness had testified from memory with this report before him that he was there at that time, and the report itself was not admissible as corroboration of his testimony.   (*People* v. *Eliyea*, 14 Cal. 145; *Baum* v. *Reay*, 96 Cal. 462, [29 Pac. 117, 31 Pac. 561]; Wigmore on Evidence, sec. 763; Elliott on Evidence, sec. 872.)

Two or three other assignments of error are made, but they are so inconsequential as to merit no specific attention.

From an examination of the whole record, we think it can be safely declared that defendant's rights were carefully protected and that the proceedings were free from prejudicial error.

The judgment and order are affirmed.

Chipman, P. J., and Hart, J., concurred.