[Civ. No. 1816.   Third Appellate District.—November 12, 1918.]

## UNION OIL COMPANY OF CALIFORNIA (a Corporation), Appellant, v. E. V. RIDEOUT, Respondent.

SAN FRANCISCO HARBOR COMMISSIONERS—PIERS AND DOCKS—RELATION BETWEEN COMMISSIONERS AND OCCUPYING BOAT OWNERS.—While the contractual relation between the San Francisco harbor commissioners and those to whom they let the privilege of docking their boats at the piers is not in a strict sense that of landlord and tenant, yet so long as the owners of boats have them in dock at such piers, though not having that exclusive right and privilege, they are as much occupants of such piers as if they were in the strict sense tenants of the commissioners.

ID.—NATURE OF RIGHT GRANTED BY COMMISSIONERS.—The right granted to boat owners by the commissioners to use the piers for the docking of their vessels is a mere privilege or license, all owners of vessels plying the San Francisco Bay having, where duly granted to them, the same privilege or license.

ID.—REPAIRS AND CORRECTION OF DEFECTS—DUTY OF HARBOR COMMISSIONERS AND VESSEL OWNERS.—While it is the duty of the harbor commissioners to correct inherent defects in any equipment of the pier essential to the loading or unloading properly and safely of freight on and from vessels docking thereat, it is incumbent on a licensee of the commissioners, while using the pier, to exercise reasonable care or such care as may be necessary to the discovery and correction of such defects either by himself or the commissioners.

ID.—DUTY OF LICENSEE TO THE PUBLIC AND TO HIS CUSTOMERS.—A licensee of the harbor commissioners using a dock for the purpose of a transportation business in which he is engaged invites the public to the dock and to use the pier for the purposes of transacting business with him, and is required to maintain in safe and proper condition the means of ingress and egress, whereby his customers go in, upon, and out of his boat, and the means whereby his freight is transferred from boat to wharf or from wharf to boat.

NEGLIGENCE — DEFECTIVE CONDITION OF APRON OF PIER SLIP — DAMAGE TO TRUCK—RELIANCE OF DRIVER ON APPARENTLY SAFE CONDITION.—In an action for damages to a truck caused by the defective condition of a pier slip occupied and used by defendant's boat under license from the harbor commissioners of San Francisco, plaintiff's driver in charge of the truck, who had, on the same day, delivered a load of oil to defendant's boat across the apron of the pier, had the right, on returning with another load and finding the apron apparently in the same condition as when he had previously used it, and as it was customarily used, to assume that there were no de-

fects in it which would render it unsafe, and he was not charged with the duty of leaving his truck and investigating to assure himself of the safety of the apron.

ID.—BURDEN OF PROOF OF NEGLIGENCE—EVIDENCE—RES IPSA LOQUITUR.—Where the evidence showed that the boat's crew regulated the height of the apron, raising and lowering it in accordance with the tide, and that investigation after the accident, which was caused by the apron giving way and falling when the wheel of plaintiff's truck was driven upon it, disclosed that two pins used to hold in place the slides which supported the apron, had by unexplained means become displaced and afforded no support for the slides, the burden was not upon the plaintiff to show that the pins were removed by the defendant or his servants, or that some act of theirs produced the defect in the apron, but the doctrine of *res ipsa loquitur* applied.

ID.—INFERENCE FROM PREVIOUS USE WITHOUT ACCIDENT.—Evidence that during two immediately preceding years the same driver had supplied oil for plaintiff to defendant's boats and had no less than twenty-five times put his truck, without accident, in the same position on the apron as when the accident occurred, was sufficient to show that, in the ordinary course of things, accidents such as those which caused the damage in this action, did not happen.

ID.—ACTION OF TIDE.—If in this action the defective condition of the apron was the result of the action of the tide, the explanation should have come from the defendant, who was charged with the special duty of protection, and whose duty it was to see that any defect so occasioned was discovered and corrected.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Walter E. Drobisch, for Appellant.

tum Suden & tum Suden, for Respondent.

HART, J.—The action was brought to recover damages for injuries to personal property. Judgment was in favor of defendant, and the appeal is prosecuted by plaintiff from said judgment.

Respondent was the owner of a certain steamer, known as the "Crockett," plying upon the waters of San Francisco Bay and tributary rivers. For purposes of docking, he had rented from the board of state harbor commissioners certain space on one of the piers at San Francisco. At the portion

of the pier used by respondent's steamer there was an apron which was lowered from the pier to the boat for the purpose of ingress and egress. It was so arranged as to be raised or lowered according to the tide and was kept in place by two iron pins, one on each side, which were passed through holes in two suspension bars.

On the 21st of April, 1915, the parties hereto entered into a written agreement by which plaintiff agreed to furnish to defendant oil for fuel to be used in various steamers, among them being the ''Crockett.'' There was a clause in the contract to the effect that defendant ''guaranteed proper unloading facilities and access to dock.''

On January 22, 1916, defendant's bookkeeper ordered oil for delivery the next day, which was Sunday. At about 10:30 o'clock Sunday morning Edward E. Ellis, a motor truck driver in the employ of plaintiff, appeared at the pier with a load of oil for the ''Crockett.'' He testified: ''I was present at pier 19 or on the portion occupied by the steamer of Mr. Rideout on the 23d of January, 1916. I was present the first time at about 10:30 o'clock A. M., next at 11:45 A. M. I was there both times with the truck loaded. The first time I went there on that day everything was ready and I backed out on to the apron and unloaded my load of oil. The apron was down the same as it usually was when the boat was in, so I backed out on the apron and unloaded the load of oil. We never backed both rear wheels on the apron. I only ran one wheel on to the apron; that was the rear left wheel. It was about three or four feet from the edge of the apron. The other wheel was on the solid part of the pier. The rear end of the truck was toward the boat. We unloaded from the rear. After having backed the truck up I put the pipe on and unloaded. I did not adjust the pipe myself. I had one of Mr. Rideout's men help me the first time. They always give us a hand. The position of the apron at that time, with reference to the main floor of the dock, was about level. It took me about fifteen or twenty minutes to unload at that time. At the time I left on the first visit there were present men in the employ of Captain Rideout. I had a conversation with one of the men of Mr. Rideout who was there at that time. His name is Mr. Peterson [should be Pierson]. He told me to come back as soon as I could and eat lunch on the boat. Mr. Peterson [Pierson] is Mr. Rideout's book-

keeper there, and I think he is the man that takes care of the ordering of the oil; he has something to do with it. I went back to the Union Oil Company station, reloaded, and came right back and backed out into the place; the pipe was already there. The apron was just about the same position. I didn't notice it had been changed a bit. I don't know anything about the manipulation of this apron. That is not up to me. I never had anything to do with that at all. Captain Rideout's boat crew handled that. They had theretofore always put it in place. It takes four or five men to move it; one man can't. I never at any time had anything to do with it. I came back the second time and backed out on to the apron as I had previously done, one wheel on the apron and the other three wheels on the dock. One of the rear wheels went on the apron and down the apron went. I tried to get the truck started the other way and she tipped me out and dumped me into a pile of barrels and the truck disappeared. As it tipped over the wheel that was on the apron pulled over on to the pier and she righted herself and went right down and hit the boat a pretty fair crack and away she went. She tore the hood and everything off as she went down." The witness stated that after the accident he examined the apron and found that the pins were "on top of the supports that held them up." He said that he had delivered oil to defendant's steamers not fewer than twenty-five times with the same truck or trucks of the same type; that he always put his truck in exactly the same position.

On cross-examination the witness testified: "When I started the oil running it was 10:30 o'clock by my watch. I do not know if the tide was going out or not. The boat was swaying a little bit, I guess; it always sways more or less. I could not say whether the apron and the lip rises with the movement of the tide. I don't know anything about tides. I know that the tide in the bay rises and falls and I naturally infer that when the tide rises the boat rises. I cannot tell you whether or not when the boat rises the apron and lip also rise. I was not gone an hour and a quarter between the first and second load. When I came with the first load there was a fireman, I think, to receive the oil. The fireman did not adjust the apron; I do not know who adjusted it. The apron was already adjusted when I landed with the first load. When I got there with the first load I did not get off the

truck. I did not report to anybody that I was there with the first load. . . . When I left there was a bunch of men working around there. After I had the truck back in place they helped me put the long pipe on. Then I unloaded my load of oil and took off the pipe. . . . When I got back with the second load there wasn't anybody there. I did not report at the office. I did not report to anybody. I did not get off the truck. I did not ascertain whether there was a change in the tide, or whether the change of the tide or swaying of the boat in any wise disturbed the arrangement of the apron and the bridge. I did not inquire of anybody whether everything was in order; there was nobody there. I did not make any inspection myself. I did not know whether the apron was safe and properly fastened or not. I naturally supposed it was all right. I backed into place as I always had done when the apron was down and the boat was in. There were always men there before that but this time nobody was there.''

The testimony on behalf of defendant was as follows: E. V. Rideout, the defendant, testified that, in January, 1916, he had the use of pier 19. ''The space we actually occupied is open to the public. I have not the exclusive occupation of this wharf. The space is not marked off. When we were not in possession anyone can come with the permission of the wharfinger on the dock, or they can come in without permission. . . . The wharfinger looks after the dock and takes care of it. He is there constantly. I have not agreed to anything as to keeping anything in order. I was under no obligation to maintain the plank, bridging, piling or anything of that kind. The harbor commissioners keep the dock in repair. I have nothing to do with the maintenance of the apron. The harbor commissioners or their agents make the repairs if any are needed. . . . The harbor commissioners supplied the ropes, chains, pins, and tackles. . . . I have never directed the Union Oil Company's trucks as to how they should drive or where or when, nor have I ever authorized any of my employees to direct them in the operation of their trucks on the dock, . . . I was not present on the day of the accident. The engineer was in charge of the boat on that day. Mr. Pierson, the bookkeeper, was in charge of the books.''

H. H. Pierson, defendant's bookkeeper, testified: ''On the 23d of January, 1916, I was in the inner office doing some work on my books. I have nothing to do with the running

of the boat other than just giving instruction when the load
is to go and come. . . . I remember the Union Oil tank wagon,
coming to deliver oil on that Sunday morning.'' The witness
told of the delivery of the first load of oil and that he asked
the driver to take dinner with them if he returned in time.
''I was there when he came back with the next load. That
was about five minutes of 12. When he came on the dock
there was a big noise. I ran out of the office. I saw a man
standing looking toward the slip. There was no truck there.
I just saw that the apron was broken; one of the cables, I
think it was on the left-hand side, looking down, was broken;
the counter-weight had dropped down; the pins were hanging
underneath, the two pins on the side of the apron. I laid one
on the dock and said, 'That is the trouble.' I said that to
Mr. Younger, one of the other employees of the Rideout
Company.''

F. H. Young, who said he was ''general utility man'' for
the E. V. Rideout Company, was with Mr. Pierson at the time
of the accident. He said that he ''heard an awful crash out-
side'' and he and Pierson ran out. He testified: ''I observed
the condition of the apron at the time. The apron had fallen
down. The two slides that had held it up had pulled through
and one of them was broken off and the other was laying
down to one side. The two pins that hold those slides in
place were both hanging by their chains. One of the counter-
weights was broken, the fastener where it fastened to the
apron was broken; one hinge was broken.'' On cross-
examination the witness said: ''The pins that hold this rod
sustain the outer end to the apron, and also these cables that
are used to hoist it up. If these pins are not in there and
any considerable weight comes upon the apron, the apron
drops, that is, if the weight is more than these cables will sus-
tain. It takes two men with great effort to operate this outer
end of the apron. I have seen two men, one on each side,
with great effort lift it, but two men on each side can handle
it very nicely. . . . The block and tackles are attached to the
outer end of the apron whenever you desire to raise or lower
the apron. It takes four men to raise and lower the apron.''

C. W. Thom, chief engineer of the steamer ''Crockett,''
testified that he was on the boat, with his full crew of three
firemen and assistant engineer, on the day of the accident;
they were at dinner and heard a slight jar on the boat when

the truck hit it. He said: "I and my crew have nothing to do with the apron. I do not exercise any authority or undertake to direct the trucks of the Union Oil Company when delivering oil. I gave the driver no orders to come back. He said he would be back, but he set no time." On cross-examination he said: "When the boat lands at this place the mate or the captain handle the men that handle the cargo. Then the men on the boats unload the cargo over this apron. When the apron is too high they lower it; when it is too low they raise it and they leave it as it may be necessary for the proper handling of the cargo. The boat's crew regulate it in accordance with the tide. About sixty men constitute the crew. I suppose there were over a dozen on board at the time this accident occurred. Whenever the wagon comes from the Union Oil Company it is the custom first for them to announce their presence and then I send somebody to handle the pipe. I have nothing to do with cables or tackles or anything of that kind whatever, nor have any of my men."

In rebuttal, the witness, Ellis, testified: "I drove on the wharf in the ordinary manner. I backed up on the apron the same as usual. It was not a place to use any speed. I had to stop and back up. It was simply a short place to back up and you can't back with any excessive speed. When the boat is in and the apron down I do not give notice to the people on the boat of my presence. . . . If the apron was not in position when we went there the boat crew put it in position." On cross-examination, the witness testified: "The truck and load of oil weighed twenty-two thousand pounds. Q. You have been to school, haven't you? A. I have. Q. How far did you progress in school? A. I went far enough to read and write. Q. You are a grammar school graduate? You know all about the tides? A. I know that the tides come in."

We have thus presented sufficient of the evidence produced by both sides to subserve the purposes of the decision herein.

The findings of the court, in substance, were that defendant was not guilty of negligence in any degree and that plaintiff's servant, Ellis, was guilty of negligence in recklessly and carelessly driving upon said apron in the absence of defendant and his employees and without examining said apron or inquiring as to its condition of safety.

The harbor commissioners have full and exclusive general control and jurisdiction over the wharves and piers of the San Francisco waterfront, and it is undoubtedly their general duty to keep the same in proper condition for the use for which they are intended and to repair them when out of order and not in proper condition for their use with safety by those docking their boats and vessels thereat. As to the contractual relation existing between the harbor commissioners and those to whom they let the privilege of docking their boats at the piers, while it is to be conceded that, in a strict sense, as counsel for the defendant contend, the relation of landlord and tenant does not exist between them (see *Morton Bros.* v. *Pacific Coast Steamship Co.,* 122 Cal. 353, [55 Pac. 1]), still it cannot be doubted that, so long as the owners of boats have their vessels in dock at said piers, though not having that exclusive right and privilege, they are nevertheless as much occupants of said piers as they would or could be if they were in the strictest sense tenants of said commissioners. We suppose it is safe to say that the right granted to boat owners by the commissioners to use the piers for the docking of their vessels is a mere privilege or license, all owners of vessels plying the waters ending in the San Francisco Bay having, where duly granted them, the same privilege or license. But it does not follow from that situation that it is not the duty of the owner of a boat or vessel, while using said piers for their transportation purposes, to see that, while their vessels are so docked, the necessary facilities or equipments for the loading or discharging of freight or the taking in or discharging of passengers are in safe and proper condition for those purposes. In 29 Cyc., page 476, it is said that "the occupant of premises, although a mere licensee, is liable for injuries inflicted by reason of his neglect or failure to keep the premises in a safe condition," and, in *Thompson* v. *Tilton Elec. L. & P. Co.,* 77 N. H. 93, [88 Atl. 216], which was an action for the death of a child, who was killed by the electric current of one of the company's poles while leaning against the pole, which stood in a public highway, the court said: "In the view most favorable to the defendant, the relation existing between it and the deceased was that which arises between two licensees upon land of a third party. Each must use ordinary care not to injure the other or his property." Even if there were inherent defects in the apron or any other of the

equipments of the pier essential to the loading or unloading properly and with safety of freight on and from the vessels docking thereat, and it was the duty of the harbor commissioners to correct such defects, it was still incumbent on the defendant, while using the pier, to exercise reasonable or such care as might have been necessary to the discovery of such defects and the correction thereof either by himself or the commissioners. This requirement from the defendant follows from the proposition that, when using the dock for the purposes of the transportation business in which he is engaged, the defendant, like the man who conducts a merchandise business of any character, invites the public to the dock and to use the pier for the purpose of transacting business with him, and, again like the merchant, he is required to maintain in safe and proper condition the means of ingress and egress whereby his customers go in upon and out of his boat, and the means whereby freight is transferred from the boat to the wharf or from the wharf to the boat. As a matter of fact, as to the plaintiff in this case, the defendant, in his written contract, guaranteed to the former, when delivering oil to his boats, "proper unloading facilities and access to the dock." By this covenant, the defendant agreed to provide the plaintiff with safe means whereby he could deliver the oil upon the boats, and thus he expressly bound himself, as the law itself had already bound him, to provide the plaintiff with such unloading facilities as would insure the delivery of the oil on board the boats with safety and dispatch.

As the evidence above quoted herein shows, Ellis, who was in charge of the truck on the day of the accident, had on some twenty-five or more previous occasions delivered oil to the defendant's boats at said pier, in the same manner in which he attempted to do so when the apron gave way and the truck was thus precipitated into the bay. On that very day, just a short time before—not much over an hour prior to the accident—he delivered a quantity of oil to the defendant's steamer "Crockett" at said pier and in doing so drove or backed the truck, as he attempted to do when the accident occurred, on to the apron. It was necessary for him thus to move the truck upon the apron to make the delivery. On his return with the second load of oil, the driver observed that the apron was apparently in the same condition that it was in when he had previously used it. He had the right to assume

that it was in the same condition, or that, being in position for its customary or usual use, there were no defects in it which would render it unsafe to use it as he had always used it. He had a right to assume that the defendant, when in use of the pier, would exercise reasonable care to see that the apron and its essential equipments were maintained in a condition to be used with safety. Particularly was he justified in so assuming, in view of the fact that he knew that the defendant's engineer and others connected with the boat knew that he would return and expected him to return to the boat that day, shortly after the first load was delivered, with another load of oil to be delivered to the boat. He was not, therefore, charged with the duty of leaving his truck and himself making an investigation to assure himself of the safety of the apron.

In *Earl* v. *San Francisco Bridge Co.*, 31 Cal. App. 339, [160 Pac. 570], an action for damages for personal injuries to an employee who was injured from a powerful electric current while manipulating a part of the electrical apparatus, which had gotten out of repair without the knowledge of the plaintiff and which defect was the cause of the injuries received by him, this court said, at page 346 of 31 Cal. App., [160 Pac. 572]: "It was not negligence on the part of respondent to assume that conditions were as before, and that the switch would disconnect the current. Having the right to assume that the appliance was in the same condition, he was excusable for his failure to make an examination or inspection whereby he might have ascertained what had been done; nor was the difference in the appearance of the equipment so palpable and obtrusive as to compel the conclusion that while hastening to perform his duty, if he had exercised ordinary care he would have discovered the change."

As above stated, the evidence shows that there was absolutely no difference in the appearance of the apron at the time of the accident from its appearance when he delivered the first load of oil that day or at any other previous delivery of oil by the same driver.

But it is asserted by the respondent that there existed a custom, of which the driver of the truck had knowledge, that whenever said driver took a load of oil to the boat, to be emptied from the truck into a tank maintained for that purpose on the boat, he was to notify the engineer or some other

person connected with the vessel of his presence with the oil before attempting to drive the truck on the apron. But we have found no such testimony in the record as it is presented here. What the engineer did testify to was this: ''Whenever the wagon from the Union Oil Company comes it is the custom first for them to announce their presence and then I send somebody to handle the pipe. I directed where the oil should go. That is the ordinary method of doing it. When the pipe is put in I am notified of it in order to direct where the flow should go.'' Again, the engineer testified: ''Before the oil is taken aboard they always notify us, because we have got to know, otherwise we would flood the tank.'' This is far from saying that it was the custom for the driver to notify the engineer of his presence at the pier for the purpose of giving the engineer, or some other person connected with the boat, an opportunity to inspect the apron to see whether it was safe to drive the truck upon it.

It is not known, or at least it was not shown, how the apron became defective or in a condition not to be used with safety, nor is it necessary to this decision that that fact should be known, since there is no claim that the driver of the truck caused the unsafe condition thereof. An investigation after the accident, however, disclosed that the two pins which held in place the slides which supported the apron were out of their proper places and were ''hanging down by their chains.'' In other words, it was evident that by some means or in some way, wholly unexplained by the record, the pins were removed from their proper places, and, therefore, afforded no support for the slides. It may be that the action of the tide had so swayed the apron as to cause the pins to become loose and so become useless for the purposes for which they were designed. However that may be, it is contended by the respondent that the burden was upon the plaintiff affirmatively to show either that the pins were removed by the defendant or his servants or that the defect in the apron was produced by some other act of theirs. We do not agree to that proposition, but, on the contrary, we think that the doctrine of *res ipsa loquitur* applies. That rule is stated as follows by Shearman & Redfield on Negligence, section 60: ''Where a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who

have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care." (See *Judson* v. *Giant Powder Co.*, 107 Cal. 549, 556, [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020].)

In *Bergen* v. *Tulare County Power Co.*, 173 Cal. 720, 721, [161 Pac. 269], which was an action for damages for death caused by the negligent installation of an electrical apparatus, the court said: "It is the rule in this state that where electricity is furnished to a system installed and operated exclusively by the owner of the premises, the doctrine *res ipsa loquitur* has no application. . . . But where the defendant in such a case *had some control over the situation* (italics ours), either by reason of its construction or its operation of plaintiff's plant, a showing of accident without plaintiff's fault shifts the burden of proof."

We have already shown that the pier and its equipments necessary for the loading and discharging of freight, during the times the vessels of the defendant occupied the pier, were under the latter's exclusive control and management. The chief engineer of the defendant's boat which was at the pier when the accident happened testified: "When the boat lands at this place [the pier], the mate or the captain handle the men that handle the cargo. Then the men on the boats unload the cargo over this apron. When the apron is too high, they lower it; when it is too low, they raise it and they leave it as may be necessary for the proper handling of the cargo. The boat's crew regulate it in accordance with the tide, and they use it wherever there is a necessity." That evidence is sufficient, if there were no other in the record, to show that the defendant had "some control over the situation" by reason of the necessity of regulating the apron in accordance with the action of the tide and of keeping it in proper condition for using it for the boat's purposes with safety.

As before shown, it also further appears from the evidence that Ellis, the plaintiff's truck driver, during the preceding two years during which the plaintiff had been supplying the defendant with oil, had delivered the oil to the latter's boats, and had no less than twenty-five different times put his truck, preparatory to emptying the oil into the tanks of the boats, in exactly the same position on the apron as he put it when the accident happened, and that never before the occasion on

which this accident happened had any trouble or damage occurred by reason of that act. This experience was sufficient to show that in the ordinary course of things such accidents did not happen. (*Kahn* v. *Triest-Rosenberg Cap Co.*, 139 Cal. 344, [73 Pac. 164].)

If it be said that the only reasonable theory of how the apron became defective was, as above suggested, that it was the result of the action of the tide, an agency not subject to human control—the act of God—still, under the rule above stated, "the explanation should come from the party charged with the special duty of protection." (Cooley on Torts, sec. 799; *Judson* v. *Giant Powder Co., supra.*) Moreover, if the condition of the apron is influenced by the tides, it is still the duty of the defendant to see that any defect therein so occasioned is discovered and corrected. We may assume that a professional navigator is thoroughly familiar with the action of the tides and the effect thereof on navigation and all the essentials of shipping.

We can perceive no escape from the conclusion that the evidence, as to which there is no dispute so far as are concerned the vital considerations upon which the case must be decided, does not support the findings necessary to the support of the judgment.

The judgment is accordingly reversed and the cause remanded.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 9, 1919.

Sloss, J., Melvin, J., Lawlor, J., and Lennon, J., concurred.